[No. 637.   December 20, 1895.]

# IN RE PETITION FOR DISBARMENT v. THOMAS B. CATRON AND CHARLES A. SPIESS, RESPONDENTS.

ATTORNEYS—UNPROFESSIONAL CONDUCT.—An attorney engaged for the defense in an important criminal trial, has the right to ascertain by proper and legitimate means the nature, strength, and credibility of the testimony to be offered in the case; and his simply visiting a witness to honestly learn what will be his testimony in the case is not unprofessional conduct, so long as he does not, by act or word, or in any manner, attempt to influence the witness to conceal, modify, or falsely change his testimony.

ID.—PROCEEDING FOR DISBARMENT—UNPROFESSIONAL CONDUCT—EVIDENCE—SUFFICIENCY.—The evidence in this cause, under the several specifications set forth in the complaint herein filed, charging the respondents with unprofessional conduct in connection with a certain criminal trial, in visiting and attempting to induce an important and material witness not to testify, or, if he did, to change his testimony, or refuse to testify on the ground that he would criminate himself, and in endeavoring to induce and inducing other important and material witnesses to testify falsely, on such trial,—is considered by the court in respect to each, and held insufficient to sustain any, of the charges and specifications against respondents therein made.

PROCEEDING for disbarment of Thomas B. Catron and Charles A. Spiess. Dismissed; BANTZ, J., concurring, COLLIER, J., in the result, and LAUGHLIN, J., dissenting, in separate opinions filed.

W. B. CHILDERS, A. A. JONES, B. S. RODEY, S. B. NEWCOMB, and JOHN P. VICTORY, solicitor general, for the territory.

NEILL B. FIELD, F. W. CLANCY, FRANK SPRINGER, and A. B. FALL, for respondents.

HAMILTON, J.—This is a proceeding upon charges and specifications for the disbarment of Thomas B.

Catron and Charles A. Spiess, who are members of the bar of this court. The testimony has all been taken on each side, and the matter is now submitted to the court for a determination. The ability and high professional standing of at least one of the respondents, the vast importance of this proceeding in its results, both to them and to the bench and bar of the territory, the great public interest manifested by this investigation, and the anxiety felt in its final determination, have rendered it proper that we should give the reasons which, we think, furnish a sufficient justification for the conclusion at which we have arrived.

The facts and circumstances out of which this investigation arose had their origin in, and are the outgrowth of, a great public criminal trial which occurred in Santa Fe county in the months of April and May, in the year 1895. On the twenty-ninth day of May, 1892, Francisco Chavez, an ex-official and prominent citizen of Santa Fe county, was assassinated. The prominence of the deceased, and the cowardly manner of the murder, aroused that intense public feeling and indignation which usually follow crimes of this character. Investigation led to the detection and arrest of Francisco Gonzales y Borrego and three others, all of whom were charged with the commission of the crime. A preliminary examination of these parties was had before the then district judge of the First judicial district in Santa Fe county, at which a large amount of testimony was taken and a large number of witnesses examined. At the regular term of the district court following, the defendants in that preliminary proceeding were indicted for this crime, and were subsequently, as above stated, tried and convicted, and are now under sentence of death, awaiting the final determination of the case in the supreme court, to which it has been appealed.

The respondents in this proceeding were counsel retained for the defendants in that criminal trial. They

appeared and conducted the case at the preliminary investigation, and also defended them on their final trial in the district court, under the indictment; and it is claimed that, while acting as attorneys for defendants in that case, the respondents were guilty of unprofessional conduct, for which they should be disbarred and removed from practice as attorneys and officers of this court. At the first session of this court in August, 1895, Jacob H. Crist, the district attorney for the First district, who conducted the prosecution in the criminal trial above referred to, appeared in this court, and filed a number of affidavits, charging the defendants with unprofessional conduct, and accompanied them with a petition, calling the attention of the court to the same, and asking the court to take such action in the premises as it should deem best. This court, upon an investigation of the affidavits, deemed the charges of sufficient gravity to call for a full investigation. The court therefore entered an order appointing a committee, consisting of four of the leading members of the bar of the territory, who, in conjunction with the solicitor general, were directed to take charge of the matter, and prepare and file in this court such charges therein as they, in their judgment, might deem proper, and to take charge of such investigation and offer such testimony in support thereof as, in their judgment, the public interests might require. Under this order the committee prepared and filed charges and specifications against each of the said respondents, to which each of them answered, denying all of the charges, and demanding an immediate hearing thereon. The committee to whom had been intrusted the unpleasant duty of filing these charges and conducting this investigation have discharged that duty with zeal and ability which commends itself to the favorable commendation of both the court and the bar.

The charges filed contain five separate and distinct specifications, charging the respondents with five sepa-

rate and distinct unprofessional acts. Testimony has been offered which, if accepted as credible, tends to the establishment of these charges. The respondents have each taken the stand, and have positively, specifically, and in detail denied all of the material allegations set forth in these several charges. The matter is therefore presented to us with a mass of conflicting testimony, upon which we are called upon to sit in judgment, much in the same way as a jury would sit in passing upon the rights of one of its citizens in a different tribunal. It is our duty to try this issue upon the evidence produced and admitted upon this hearing, and to bring to its consideration that calm, deliberate, and unbiased judgment which should ever characterize judicial investigation, and by which a just, correct, and proper conclusion alone can be reached. The respondents have a right to invoke in their behalf, at the hands of the court, that same presumption which should be accorded to the humblest citizen, when placed on trial for the most trivial offense. The prosecution has a right to expect that full, fair, and just credit to all of its testimony which it would demand at the hands of a jury in another and different court. Both parties have a right to demand that, in our consideration and determination, we will be guided by those rules of presumption and the principles of evidence which have become established as a result of the combined wisdom and experience of ages. Guided by these principles, let us come to the consideration of all the testimony offered by either side in this proceeding, and giving to each the full measure of credit to which it is entitled. Let us arrive, if we can, at what is a just and correct conclusion.

The first specification against the respondent Catron charges him with unprofessional conduct, in substance, that he (the said Catron) procured an interview with one Ike Nowell, who was a material witness for the said

ATTORNEYS: unprofessional conduct.

prosecution in said Borrego trial, and who testified on the preliminary examination, and endeavored to get the said Nowell to give entirely different testimony from that which he (the said witness) had given, and tried to get the said witness to avoid testifying in the said cause. The testimony admitted by both sides shows that Nowell was a material witness for the prosecution in that trial, and testified on preliminary examination to material facts, seriously damaging to the defendants; that, after that examination, he was tried and convicted in the district court of Santa Fe county of the crime of adultery, and sent to the penitentiary, and was in the penitentiary at the time of the beginning of the trial of the Borregos for murder; but the prosecution, desiring to use him as a witness in that trial, had secured for him a pardon during the progress of that trial; but the respondent Catron, having been present at the preliminary examination, and having learned that the witness would be pardoned and would again be introduced as a witness on behalf of the prosecution, went out to the penitentiary, and had an interview with the witness Nowell, a few days before he was released and placed on the stand. The testimony of the respondent, uncontradicted, is that the witness Nowell had made two statements, one under oath at the preliminary hearing, and the other and different statement to his partner, Mr. Spiess, the other respondent herein, which statements were entirely opposite to each other, one favorable to his client, and the other favorable to the territory. The respondent. as he says, visited the witness to learn from him which of these statements was true, and which he (the witness) would testify to when again placed on the stand. If the respondent, as he says, honestly believed that the witness had made two statements in relation to the case in which he was a witness, which statements were diametrically opposite to each other, one favorable to his

client and the other unfavorable, then the respondent had a right to use all legitimate and proper means to ascertain which statement was correct, and had a right to talk to the witness himself and learn from him which statement was correct, provided he did not use any improper means, by word or act, to induce the witness to conceal, change, or in any way give improper testimony. Attorneys engaged in the defense of important criminal trials have the right to ascertain by proper and legitimate means the nature, strength and credibility of the testimony to be offered in the case, so long as they do not by word or act attempt in any manner to influence a witness to conceal, modify, or change his testimony from that which is absolutely true. We know of no rule of morals or professional ethics which is opposed to this view. If this is not allowed, then you break down the barrier which the law and the courts have erected as a shield to protect the lives and liberty of the citizens from what might prove an unjust and designing prosecution. We do not wish to be understood as in the slightest degree countenancing any conduct on the part of any attorney in attempting in any manner to influence a witness to conceal, change, or in any manner give improper testimony under any circumstances. Such an act, when established, should meet with condemnation by the bar, and should be visited with disbarment by the court. We discover, however, no unprofessional conduct in the respondent in his simply visiting the witness to honestly ascertain what would be his testimony, so long as he did not in any way attempt to influence him to conceal, falsely change, or modify his testimony.

But it is contended by the prosecution that the respondent Catron visited the witness Nowell for an improper and illegal purpose; that he endeavored to induce the witness not to testify on the trial, or, if he did, to change his testimony, or refuse to testify on the

UNPROFESSIONAL conduct: evidence: sufficiency.

ground that he (the witness) would criminate himself. If we were to credit the whole of the testimony of the witness Nowell, then this part of the charge is established, as Nowell states that the respondent Catron came to the penitentiary, and he had a talk with him, in which the respondent Catron told him (the witness), in substance, that he (Catron) did not want him (the witness) to testify, as he had done before, about seeing the Borregos on the night of the killing of Chavez, and that when the witness asked the respondent how he could "get out of it," and if they would not "get him into trouble for perjury," the respondent told him (the witness) that he could refuse to testify on the ground that the answers "would criminate him" (the witness); that the respondent told him (the witness) that he (the respondent) would be there at the court, and would defend him (the witness) if he got into any trouble. The respondent denies this statement positively and unequivocally. The respondent states that he visited the witness, and had the interview with him, for the purpose solely of learning what his testimony would be upon the trial; that having been advised that the witness had made two statements in relation to the matter, one to Spiess, and one on the preliminary examination, each different from the other, he (the respondent) desired to know which was the truth; that the respondent visited the witness honestly for the purpose of learning from the witness which statement was true. One statement made by the witness was favorable to the clients of the respondents, and one was against them, and favorable to the prosecution; and the respondent, in the interest of his clients, with a desire to learn the true facts, had the interview with the witness. The respondent denies positively that he attempted in any way or manner to influence the witness, or attempted in any way to induce him to change or modify his testimony, save to tell the truth. Re-

spondent testifies that, in his interview, he (the witness) admitted to respondent that the testimony given by him (the witness) on the preliminary examination for the prosecution was false, but the other statement made to Spiess, favorable to the defendants, was true; that he was induced to give his testimony on the preliminary examination because he (the witness) thought it would help him on his trial on the indictment then against him. The testimony of the respondent is a clear and positive denial of the testimony of the witness Nowell that he (the respondent) made any attempt whatever, in any manner, to induce the witness Nowell to swear falsely or change or modify his testimony in any way to conflict with the truth. No one was present when this interview was had, save the witness Nowell and the respondent Catron.

Upon the testimony of these two witnesses, standing in direct opposition upon this part of the charge, neither being supported by corroborating facts, we are asked to reach a conclusion as to whether the first charge is sustained. If this were but a civil suit to recover a debt, instituted by Nowell against the respondent in any of the inferior courts, and the only testimony was the affirmance of one as to the debt, and a positive denial by the other, assuming both to be of the same credibility, could the court pronounce a judgment upon the testimony of Nowell? Under the evidence offered before the court and contained in this record, these two witnesses do not stand before the court possessing equal credibility. The uncontradicted record shows Nowell to have been a penitentiary convict, indicted, tried, and convicted of a felony, and sentenced to imprisonment. He abandoned his home, deserted his family, disavowed his marriage, dishonored his children, and became the companion of disreputable characters, until he is pronounced, by some of his neighbors, at least, as unworthy of credit. Take the

testimony of this witness, weigh it in the scales of impartial justice, as against the testimony of the respondent, test it by those rules which should guide conscientious judicial action, and can we, upon it, pronounce a judgment which will result in the disbarment of the respondent? We do not believe that such a conclusion could be sanctioned or sustained, either by reason or judicial authority. We therefore are irresistibly led to the conclusion that this charge is not sustained by the evidence.

The ground of the second charge of unprofessional conduct against the respondent Catron is, in substance, that one Porfilia Martinez de Strong was a witness who testified for and on behalf of the defendants in the trial of the Borregos, both at the preliminary hearing and at the final trial, and that such testimony was material, and that it was false, and that she was induced to give such false testimony by the improper conduct of the respondent. Her testimony shows that parties came to her house at Lamy at night and brought her under what she supposed was a warrant, to Santa Fe; that she was taken to the house of Charles Conklin, and he told her what she was brought for, and what she must testify to; that she went upon the stand at the preliminary hearing, and gave this testimony; that, upon the final trial, she was again brought to Santa Fe, and taken to a room in the office of the respondent Catron, and slept there; her meals were brought to her; that she was brought to the courthouse, and testified, and was then taken back to this room, and remained there until the train went out, and then returned home. She was brought back a few days after, was placed again on the stand by the district attorney, and was cross-examined. In this latter examination she testified that all her former testimony given for the defendants, both in court and on the preliminary hearing, was false and untrue; that she was induced to give this false testimony because

she was afraid to tell the truth. Her testimony in this regard is clearly contradicted by other witnesses in the case. The testimony of these witnesses is that they went down to Lamy, and brought her up here upon a subpoena; the respondent, I think, testified that he had a subpoena issued, and that he gave it to the witness Thayer. Thayer went for this woman, and brought her up. She was brought here at the expense of the defendants. The money was paid, I think, part by the respondent himself,—an amount which would be her legitimate fees, which she could have claimed, and which she would have been entitled to. She was brought to the office of the respondent Catron, and placed in a room there by Thayer. She remained there all night; took her meals there during the next day. She returned to that room after she testified in the court room on the trial; was kept there until the train went out; and was then put on the train, and sent home. The respondent Catron states that he had heard that she was a material witness and that he asked that she be sent for and brought here in order that he might see her; that she was subpoenaed as stated, and brought here; that he did not know she was in his office until the next morning when he found her there, and he asked her what she was doing in the office; that she said she had been brought up there by this man Thayer, who had brought her from Lamy; he then asked her what would be her testimony; that she said in reply that her testimony would be the same as it was on the preliminary trial. Respondent states that he said to her: "I don't remember what that was. Will you repeat it to me again?" She then sat down, and repeated to him her testimony substantially as she had given it upon the preliminary examination. He then left her, and went off, and engaged in other business connected with the trial of the case, and she was afterwards brought upon

the stand and testified. After her testimony in chief was through, and the prosecution announced that it desired time to get out the transcript of her evidence on the preliminary examination, before they could be ready to conduct the cross-examination of this witness. The respondent then announced that he would not be responsible further for her fees. This witness then went home, and in a few days came back, and went upon the stand, and denied positively the truth of the statement which she made upon two previous occasions, when put upon the stand as a witness. The respondent denies that any threat of any kind or character or any influence was used or attempted to be used upon this witness. I find that the testimony of this witness stands before us, denied in part by the witness Conklin, denied in part by the witness Spiess, denied in part by the witness Thayer, denied in part by the witness Domingues, and denied, in so far as any criminality is shown, by the respondent Catron himself. We therefore must say there is only one conclusion to which the court can come in examining this testimony with reference to the second charge or specifications,— that it is not sustained by the evidence.

The third charge is in reference to, and charges, that the respondent Catron had attempted to influence or control improperly the testimony of the witness Max Knodt, who was a witness for the prosecution on the preliminary trial of the Borregos, and that he obtained for him a pass to Wingate, as a means of inducing him to give improper testimony. This charge, I must say, is sustained in no part, except in the fact that respondent did obtain for the witness Knodt a pass to Wingate. The witness Knodt himself comes upon the stand, and testifies that he wanted to go to Wingate. He asked some person whether he could obtain a pass. He was directed to Mr. Spiess. Mr. Spiess directed him to Mr. Catron. Mr. Catron,

after a conversation with the witness, applied for a
pass for him to Wingate. The witness says that Mr.
Catron told him that he must be there at the Borrego
trial; that the court would fine him $25 if he did not
come. In this statement of the witness, he denies
positively that Mr. Catron discussed his testimony in
the Borrego case with him, or attempted in any way
or manner to induce him, or to influence him, to con-
ceal any part of his testimony, or modify or change it
in any manner whatsoever. The respondent testi-
fied that he obtained the pass; that the witness Knodt
applied to him for a pass to go to Wingate to see a
lady out there, whom he desired to visit, who used to
be a servant in Mr. Catron's house. Mr. Catron told
him that he could not, probably, get him a pass upon
that ground, but, if he could transact some business
for him (Catron), that he might be able to obtain the
pass for him. This statement of the respondent Catron
we must prefer to the other, because it is not denied.
No attempt or effort has been made to show that the
statement of the respondent as to the reasons why he
obtained the pass in behalf of Knodt is untrue.
Therefore we must accept the statement of the respond-
ent as true with reference to this fact, and I say that
in view of the condition of the testimony, the third
charge in reference to the witness Knodt is not sus-
tained in any particular.

The fourth charge is based upon the testimony of
Mrs. Baca, who is the mother of Luis and Mauricio
Gonzales. 'Luis Gonzales and Mauricio Gonzales were
two material witnesses for the prosecution in the trial
of the Borregos. Luis Gonzales had testified upon
the preliminary examination, and also was brought
and kept as a witness to be used on the final trial. It
is claimed in this charge that the respondent Catron
sought, by the use of money, to induce this woman,
who is the mother of these boys, to get them away

from the court, or to get them to modify their testimony or change it, or, rather, not to testify against the Borregos. She states in her testimony that she was going by the office of Mr. Catron, and he knocked on the window, raised it, and called her up to the office. She came up to the office, and in her conversation with Catron something was said with reference to her pension papers. She talked about the papers, and offered to pay Mr. Catron for his services in her behalf connected with the papers. Mr. Catron stated that he did not want any pay for the services he had rendered. According to her statement, all he wanted was for her to do something to aid and assist the Borregos. She said that he then offered to pay her money, give her assistance, be her friend, and give her help, if she would induce her sons to testify in behalf of the Borregos, or not to testify against them. This is the statement made by her. This conversation occurred in the presence of the respondent and this woman alone. Nobody else was present. Respondent goes upon the stand, and positively, without hesitation, and without qualification, denies wholly and absolutely this statement. So we have, so far as this charge is concerned, the testimony of the woman Mrs. Baca, on the one side, and the testimony of the respondent, on the other. Under our views of the weight which should be attached to testimony, and the amount of evidence which should be required to establish and sustain a charge of this kind, we conclude that under this testimony, taking these two witnesses as they stand before us, assuming them to be of equal credibility, the prosecution in this charge have wholly failed to sustain the allegations made.

Now, as to the fifth and last charge, that the respondent attempted, by the use of money and other means, to influence the witness Mauricio Gonzales to testify falsely or improperly in the trial of the Borre-

gos: The respondent Catron denies absolutely that anything of this kind was done; denies that he offered any money, that he agreed to pay any money, or that he offered any kind of inducement to this witness to testify falsely or untruthfully in any way in this cause. The testimony upon this point is not corroborated by any other facts or any other circumstances. Therefore we say that, under this testimony, even if the witnesses were of equal standing, this charge can not be sustained. It may be proper, however, in order to see and understand the weight which should be attached to the testimony which is offered by the prosecution in this case, to look at it for a moment. The testimony is that the woman, Mrs. Baca, upon whom the fourth charge is based, was a woman whose character was such as to render her unworthy of credit. The testimony shows, too, that the witness Luis Gonzales and the witness Mauricio Gonzales were witnesses of such character as to render them unworthy of belief. Prominent citizens of this community, officials in high standing, prominent members of the bar, reputable business men in large numbers, have come upon the stand, and have testified, without qualification, that they would not believe these witnesses under oath, in consequence of their character, their reputation, and their standing in this community. The witness Porfilia Martinez de Strong,—her testimony itself has furnished facts sufficient to mete out its own condemnation. She twice testified to one thing. She came upon the stand subsequently, and testified directly in the opposite way. Here we have a witness of this character coming upon the stand, testifying in directly opposed directions in the same case. Besides, the testimony which has been introduced with reference to character applies to her as well. The testimony of Mauricio Gonzales shows that he has been willing to make affidavit on both sides of the case. He testified in one

way, and then made an affidavit in another way. So
that, having taken this testimony, and applied to it
those rules which the court ought to apply in weighing
testimony, giving to it that credit to which it is
entitled, we must conclude that these charges are not
sustained. It may be proper, .also, to remark that
these charges are five in number. Each stands by
itself, a separate and distinct charge as to a separate
and distinct act, alleged to have been done at separate
and distinct times, with separate and distinct individ-
uals. It is proper to say that the testimony in no one
of these charges tends in any way to establish the
truth of any of the others. Therefore, we must dis-
pose of these charges separately, upon the testimony
which has been offered applicable to that particular
charge. Viewing it from that standpoint, and apply-
ing the rules above given to this testimony, we must
conclude that this evidence is not of a character that
commends itself to credit, and is not testimony such as
we ought to disbar respondent upon.

As to the respondent Spiess, it is charged that he
made a trip to Las Vegas, to see the witness Domingo
Apodaca, who had been examined upon the prelimi-
nary trial of the Borregos, and that he endeavored to
induce her to swear falsely in the Borrego trial. It
was stated by the district attorney, in the opening of
the Borrego trial, that he expected to prove a confes-
sion made by Francisco Gonzales y Borrego to this
Domingo Apodaca; that the respondent went to Las
Vegas with a knowledge of that fact, and had an inter-
view with this witness, and in that interview he offered
her money, offered her support, offered his protection
as a lawyer, and the protection of his firm, if she would
not testify against the Borregos. This is her testi-
mony. In this respect the testimony of the witness
Domingo Apodaca is denied by Mr. Ortiz, who says he
was present at the entire .interview which was held

between the respondent Spiess and the witness Domingo Apodaca in Las Vegas, and that no such conversation occurred. The respondent also denied the statement. So we have the testimony of these two witnesses against the testimony of the witness Domingo Apodaca. The other evidence with reference to her shows that she is a public prostitute. Her testimony, as I think, is of such a character as to cause the court to, at least, concede to it only a limited amount of credit; but against her testimony alone, uncorroborated, denied as it is by the testimony of the other two witnesses, which stands uncorroborated, we think that this charge with reference to the respondent Spiess is not sustained.

It is charged that the respondent Spiess offered money to Luis Gonzales; that he was in front of the postoffice; that he was met there by Gus O'Brien, and Gus O'Brien asked him if he did not want a job, if he did not want work. He said that he did, and went with Gus to the office of the respondents, Catron and Spiess. He went to the office, and Mr. Spiess was absent. Gus O'Brien telephoned to the Palace Hotel, and in a few minutes Mr. Spiess came in. Mr. Spiess spoke to him, and he spoke to Mr. Spiess. He says that he asked Mr. Spiess what he wanted. Mr. Spiess said that he wanted him to do something for him; that he wanted him to help him in the Borrego case; that he wanted him to make an affidavit that Gov. Thornton had offered him (the witness) money to swear as a witness in the Borrego case; that he would give him $10 if he would do so. Spiess sent Gus O'Brien into the other room to get the check book; that he brought out the check book; that he instructed Gus O'Brien to draw him a check for $10 for Gonzales, and offered it to him, to influence the witness in that case. The respondent's testimony is that this is not true. He denies positively that he offered him any-

thing, that he drew or had any check drawn, and denies that he wanted him to help him in the Borrego trial. The testimony upon this subject is the testimony of these two witnesses, the witness Gonzales, upon one hand, and Spiess, the respondent, upon the other. In the light in which we view the testimony of Luis Gonzales, and the credit which, in our judgment, it is entitled to receive, it is not such as to warrant us in finding the defendant guilty of this charge.

It may be contended that this conduct of the respondents in going to these witnesses, and talking to them, was of itself improper. It may also be contended that the sending for and the bringing of a witness here, in the manner in which they (the respondents) did with reference to the witness Porfilia Martinez de Strong, is improper and unprofessional conduct. If the record in this case contained testimony which could in any way establish the fact that the respondents brought these witnesses to their offices, or visited them with the view of in any way influencing their testimony, or if there was credible testimony showing that they attempted to tamper with any of the witnesses, then it would be our duty to find the respondents guilty. We can not, however, find from this evidence that such was the case. The vast importance of the trial in which the respondents were engaged, the intense public interest that was manifested and centered in its result, the bitter feeling of hostility which was engendered between the prosecution and the defense, led the respondents, as they say, to distrust the officers in serving their process for their witnesses, and caused them to have subpoenas issued in the case, and have them served by others outside of the regular officers, and caused them to bring some of their witnesses to their offices for consultation. We can not discover in their conduct anything which will warrant us in adjudging the respondents guilty.

The position of an attorney and counselor at law is that of an officer of the court. His relation to the court, the bar, and the public is one of trust and confidence. To his integrity and ability are not infrequently intrusted the lives, the liberty, and property of the citizen. Years of time, arduous labor, and constant application are required to elevate him to that professional standing which enables him to discharge with fidelity the responsible duties intrusted to his care. If dishonest practices and unprofessional conduct have caused him to forget his obligations, and led him to a violation of this sacred trust, his name should be stricken from the roll, and he should be removed from a place in the ranks of the profession which he is found unworthy to fill. But a result so humiliating in its effect and so disastrous in its consequences to him should not be reached upon circumstances that appear merely suspicious, but only upon that credible and convincing testimony which will lead with reasonable certainty to the establishment of his guilt. By the laws of the country and the sanction of the courts, he has been admitted to that profession to which the energies of his life may be devoted. His zeal and ability may have gained for him a position of eminence and distinction in his calling, and he has thereby acquired a right of property in the privilege of engaging in its practice. This right and privilege should not be destroyed or taken from him, and he be deprived of its benefits, and driven in humiliation and disgrace from the profession, unless upon reliable proof,—such proof as would be sufficient to satisfy the mind of the court in determining questions involving the liberty and property of the citizen.

Giving full consideration to all the testimony offered in this investigation, considering the credibility of the evidence, and the character, standing, and reputation of the witnesses presented in support of these

charges, each charge being supported by an uncor-
roborated witness, whose credibility is impeached,
both by his own evidence and by independent proofs,
—place this upon the one side, give to each portion of
it that full weight and consideration to which, in the
most favorable light, it should receive, place against
this the open, frank, positive, and unqualified denial
by the respondents of each criminating fact contained
in the charges, apply to this conflicting evidence the
test of those well-established rules by which its char-
acter and weight should alone be determined, weigh
each part of it in that just and impartial scale which
should ever measure and control judicial decisions,
and we are led irresistibly to the conclusion that none
of the charges and specifications against the respond-
ents are sustained by the evidence, and they should be
dismissed.

BANTZ and COLLIER, JJ., concur in the conclusion
reached, but file separate opinions herein.

COLLIER, J.—In concurring in the conclusion of a
majority of the court in this case, I can not assent
to all that is said in the opinion of the court. It was
announced at the time the judgment of the court dis-
missing the charges was rendered that some observa-
tions on certain practices indulged in by respondents
would form a part of the opinion of the court. Many
matters expected by myself to be adverted to are not
contained in the opinion, or referred to either directly
or indirectly. As to these I will not submit any views,
because, as they in no way appear on the face of the
record, I will not impart them for the mere purpose of
giving an individual opinion.

The opinion does, however, contain some things I
must express my dissent from. I do not believe that
an attorney having a high sense of professional de-
corum and ethics would have permitted himself to visit

the witness Nowell, upon the plea that he honestly desired to ascertain what the witness would testify to, because he had stated to another in conversation a different state of facts from what he had already testified to. He could not rest upon the presumption that the witness would repeat his former testimony, and it was not the office or business of the attorney against whose client that testimony militated to give that witness any warning or advice as to the pains of perjury. The fact that witness could have testified in a certain way, and is told by the attorney of the client against whom that testimony bore that it would be shown that he made contradictory statements, is itself a threat tending to the suppression of testimony. The attorney should have relied upon his right to impeach the credibility of such witness according to the rules of evidence, and the practice of the courts, and I can not agree that I "discover no unprofessional conduct" in the respondent's visiting and talking with the witness Nowell. While I think his act was blameworthy, I do not think it such reprehensible conduct as deserves disbarment.

Other matters I do not care to advert to, except to say that I believe counsel should so bear themselves toward witnesses who are subpoenaed for the side to which they are opposed as not to give rise to the suspicion of improper influences being exerted; and I think that, so far as the witnesses Max Knodt, Domingo Apodaca, and Luis Gonzales are concerned, the respondents do not appear to have so conducted themselves as to ward off suspicion. If the two latter witnesses were of such unsavory character as the testimony of the respondents shows, and which the court takes as established, it were better for counsel to have kept aloof, instead of seeking one and being visited by the other, as is the case so far as respondent Spiess is concerned, it not being denied that Spiess visited

Domingo Apodaca, nor that Gonzales came to his office upon the request of his employee.

I have thought it my duty to say this much as to the concurrence I give to the court's opinion, because these matters appear on the face of that opinion.

BANTZ, J. (concurring).—It is a sufficient statement of reason for the conclusion reached in this case to say that whatever testimony there may be tending to sustain the substance of the charges comes from those who do not commend themselves to confidence, and such testimony can not outweigh that of men of respectable reputation.

LAUGHLIN, J. (dissenting).—This is an action brought on information filed in this court by Jacob H. Crist, as district attorney for the counties of Santa Fe, Rio Arriba, and San Juan, for the disbarment of the respondents, and to exclude them from the office, rights, and privileges accorded them as attorneys and counselors at law of this court.

In recording my dissent from the opinion filed by a majority of the court, and a dismissal of the charges filed herein against the respondents, it is done through a sense and an appreciation of the official responsibilities of the position and the obligations of my oath, and out of the respect and reverence I have for it, and the duty, respect and confidence possessed in me for the public and for the public interests involved and shown in this matter. Were my personal feelings and inclinations permitted to control over what seems to me to be an official duty which I owe to the position, and from which I am unable to see any avenue through which to escape, there would certainly be no dissenting opinion recorded by me in this particular and important case. To concur in an opinion by a majority of my brothers upon the bench, for all and in all of whom I have but the profoundest respect and confidence, is both

an easy and a pleasant duty, and one to which there is always a certain degree of pride and honor attached; but to dissent on the facts in a case of this nature and importance, and to justify that dissent, is a duty unpleasant in the extreme.

This case arose immediately out of a criminal prosecution in the district court of Santa Fe county, wherein Francisco Gonzales y Borrego, Antonio Gonzales y Borrego, Lauriano Alarid, and Patricio Valencia were indicted, tried, and convicted for the murder of ex-sheriff Francisco Chavez; and in making this statement it is proper and necessary, in order to understand fully all the facts and circumstances, to resort to records now in that court, which are not part of this record, but which are public and notorious facts throughout the territory. During the nighttime of May 29, 1892, said Chavez was assassinated in Santa Fe by parties lying in wait, four bullets having penetrated his body. For some time thereafter it was not known who the assassins were. During the latter part of the year 1893, W. P. Cunningham, then sheriff of Santa Fe county, obtained information from one Luis Gonzales, which led him to the discovery of the murderers of said Chavez; and in November or December of that year one Francisco Rivera made an affidavit before Judge Seeds, judge of the district court, sitting as committing magistrate, that said Francisco Gonzales y Borrego, Antonio Gonzales y Borrego, Lauriano Alarid, and Patricio Valencia and Hipolito Vigil were the guilty parties, and thereupon a warrant was issued, and placed in the hands of the sheriff, for their arrest, and all were immediately arrested, except Vigil, who resisted, and was shot and killed by the sheriff's posse. During January following, Judge Seeds, sitting as committing magistrate, heard the preliminary examination, which lasted some three weeks, and at the close held the said four defendants, and committed them without bail; and

at the sitting of the succeeding grand jury they were all indicted for murder in the first degree; and during May and June, 1895, they were placed on trial on the indictment, which continued about forty days, resulting in a verdict of "guilty as charged." Motions were made for a new trial and in arrest of judgment, and after an exhaustive argument in behalf of the motions they were both denied, and thereupon sentence of death was pronounced on the defendants, and error was sued out in their behalf, and the case is now pending in this court. Since the trial and conviction and the passing of death sentence by the court, two of the accused, to wit, Lauriano Alarid and Patricio Valencia, have confessed that all four of the defendants and the said Hipolito Vigil did commit the murder in the manner charged, and that the testimony given on the trial by the prosecution was substantially true. These confessions were in writing, signed and sworn to by two parties making them, and in the presence of a brother of one of them, and have been printed in the public press of the country, and have become a part of the public history of New Mexico. Chavez, by reason of his personal presence, his goodness of heart, and his kind and generous disposition, had attached many followers, not only of his political faith, but of the opposite faith as well, so that at the time of his assassination, and for a number of years prior, he was the acknowledged leader of his party, and much the strongest man politically in the county, and it was well known that he could elect or defeat any man he desired in local politics; and the testimony given at the preliminary hearing and on the trial on the indictment tended strongly to show that the primary motive for his assassination was political jealousy, a fear of his popularity and power, and an inordinate desire to remove him from the road of political preferment. I was of counsel for the prosecution at the preliminary hearing before Judge Seeds, and

was therefore disqualified; and by agreement of all parties Judge H. B. Hamilton, of the Fifth district, came to Santa Fe, and gave his most patient, painstaking, and laborious attention to the long, tedious trial, and pronounced the death sentence on the four convicted defendants.

The information in the nature of charges upon which this action is based was filed by Jacob H. Crist, as district attorney, and who as such prosecuted for the territory in the case for the murder of said Chavez, out of which trial this case directly grew, and the firm of Catron & Spiess appeared for the defense. Said information was filed at a former day of this term of the court, and the court took the same under advisement, and, after due consideration, referred the same to a committee of highly respectable members of the bar, to wit, J. P. Victory, of Santa Fe, as solicitor general of the territory; A. A. Jones, of Las Vegas; B. S. Rodey and W. B. Childers, of Albuquerque; and S. B. Newcomb, of Las Cruses,—with power and authority to investigate and inquire into the information so filed, and to prepare and file such charges and specifications, if any such should be required, as in their judgment might seem proper, and to prosecute the same before the court. At a subsequent day the committee filed charges and specifications, which are, in substance, as follows, to wit: (1) That the respondent Catron was guilty of unprofessional conduct in connection with said trial in this: That one Ike Nowell was an important witness to very material facts for the prosecution in said trial, and that he had testified as such witness at the preliminary examination of said defendants, in January, 1894; and that before he had given his testimony he had been tried and convicted of adultery under the laws of the United States, and that after he testified at said preliminary hearing he was sentenced to three years in the New Mexico penitentiary; and, that while he was so

confined, and during the progress of the trial of said defendants on the indictment, said respondent, believing that said Nowell would be introduced and examined at said trial as a witness on behalf of the territory, went to the said penitentiary, sought and had an interview with said Nowell, and in said interview endeavored to persuade him to give different testimony, when he should be introduced as such witness, from that which he had given on said preliminary examination, and suggested to said Nowell that he might avoid testifying to the facts which he had testified to at said preliminary examination by declining to answer upon the ground that the answer might criminate him; knowing that the witness then and there claimed that the testimony given by him, said Nowell, on said preliminary examination, was true. (2) That the said respondent was guilty of unprofessional conduct in connection with said trial in this: That one Porfilia Martinez de Strong was examined as a witness on behalf of said defendants at said preliminary hearing, having then testified to material and important facts, and that she was so induced to testify by means of intimidation and fear, caused by threats and false pretenses exercised over her by certain agents of said respondent, who claimed and represented to her that they were sent by said respondent to bring her as a witness, as officers of the law, when in fact they were not such; and that she was again introduced as a witness at the trial on the indictment, and testified on her examination in chief to material facts in behalf of the said defendants; and that she was so induced to appear and testify by reason of fear and intimidation exercised over her by said respondent and his agents; that one Fred Thayer was sent to Lamy to bring her to Santa Fe, and that said Thayer represented to her that he was a deputy sheriff, and arrested and took her into custody and brought her to respondent's law office in the nighttime, and kept and

retained her in his private office the remainder of the night, and took her from there direct to the courthouse, and on the conclusion of her examination in chief (the district attorney declining at that time to cross-examine her until he could have her former testimony written out) took her directly back to said office, and retained her there until 10 o'clock that night, and then sent her home,—all of which conduct on the part of the respondent and his said agents tended to intimidate said witness; that she returned a day or two thereafter, and on her cross-examination testified that the facts which she had testified to at the said preliminary examination and on her examination in chief on said trial were false and untrue, and so given because of fear and intimidation as aforesaid, she being an ignorant and friendless woman. (3) That said respondent was guilty of unprofessional conduct at said trial in this: That one Max Knodt, a witness, testified to important and material facts on behalf of the prosecution at said preliminary examination, and was offered as a witness to prove the same facts at the trial on the indictment, but on said trial said witness testified differently, and in such manner as to render his testimony valueless to the prosecution on said trial; that said Knodt admitted on said trial as such witness that respondent Catron had promised to procure for him a railroad pass from Santa Fe to Fort Wingate and return at any time said Knodt should desire one, and did so procure a pass for said Knodt; that the procuring and giving said Knodt said pass was for the purpose and had the effect of inducing him, said witness, to change his testimony from that given on the preliminary hearing, and to render it valueless to the prosecution. (4) That said respondent Catron was guilty of unprofessional conduct in connection with said trial in this, that subsequent to the preliminary examination, and prior to said trial on the indictment, said respondent offered money

and other inducements to one Rosa Gonzales y Baca, mother of Luis and Mauricio Gonzales, two important and material witnesses in behalf of the prosecution, and by said offer endeavored to procure her to induce her said two sons to testify falsely on said trial on the indictment. (5) That said respondent was guilty of unprofessional conduct in connection with said trial in this, that he, subsequent to the said preliminary examination, and prior to the trial on the indictment, offered said Mauricio Gonzales money, and attempted otherwise to induce said Gonzales to make a false affidavit as to his information with reference to material facts about the killing of said Chavez by said defendants.

The witness Nowell, during the January, 1894, term of the United States court, held at Santa Fe, and at the same time the preliminary hearing in the case of the territory against the said Francisco Gonzales y Borrego, Antonio Gonzales y Borrego, Lauriano Alarid, and Patricio Valencia, which will hereafter be styled the "Borrego Case," was being had for the murder of said Chavez, was indicted, tried and convicted of the crime of adultery, in which respondent Spiess appeared as his attorney, and after the conviction, but before sentence was pronounced, he was offered as a witness by the prosecution in the Borrego case, and gave material and damaging testimony against the defendants, and afterward the court passed sentence, and fixed his punishment at three years in the New Mexico penitentiary. During the trial of the Borregos on the indictment, knowing the importance of Nowell's testimony, and that he had served nearly half of his time, I joined the governor, who had previously written fully all the facts, in a telegram to the department of justice, requesting a pardon for Nowell, that he might again give his testimony on the trial; and immediately upon the receipt of the telegram the president granted the pardon, and so notified the superintendent of the peni-

tentiary; and the testimony shows that during the next day after the superintendent received the notice of the pardon the respondent took a buggy and an employee in his office and drove, not by the usual way, but by a circuitous route, to the penitentiary, and there sought and obtained a private interview with Nowell, in which Nowell told respondent that he had been notified by the superintendent of his pardon, and that he was then a free man, and that the superintendent had requested him to remain until his clothes could be prepared, but that he did not know by whose influence the pardon had been secured; and the substance of that interview is here given as taken from the witness' mouth by the official stenographer, on his examination in chief:

"Q. How came Mr. Catron to see you? State it to the court, if you will. A. He came out there, and sent for me to come into the private office. I went up, and sat down on one side of the table, and he says—asked me how I was getting along; and he says, 'I don't want to— It is my business out here, that I don't want you to testify in this case,—the Borregos killing Chavez.' And I told him I didn't see how I could get round it. I says, 'I gave my evidence in the preliminary examination,' and I says to refuse to testify they would get me for perjury; and he says, 'No; they won't.' He says, 'I will tell you now what to do.' He says, 'You, when they ask you if you know the Borregos, you can tell them, "Yes,"' and he says: 'If they ask you if you know of how Chavez was killed, you refuse to answer the question. Just say it would incriminate you.' And I sat there for a while, and he says to me,—and I didn't pay much attention to it,— he asked me what I thought about it. 'Well,' I says, 'I don't know.' I says, 'I have had enough of this trouble, and I don't want any more trouble about it;' and he says: 'I will defend you. I will protect you. Do just as I tell you, and I will defend you.'

"Q. State whether he said anything about bringing an action against them for keeping you in the penitentiary at that time? A. He said I could bring an action against them.

"Q. How long had you been there in custody after you supposed you were entitled to be discharged? A. Just the evening before. That was on Saturday, I believe, and on the sixth day of May, and I was turned out on the seventh.

"Q. Did you know you were to testify before Mr. Catron came out to the penitentiary to see you? A. I was satisfied what I had been pardoned out for.

"Q. Well, when Mr. Catron called on you at the penitentiary, did he say his business relations with you were as your attorney in the adultery case? A. I believe he did.

"Q. What, if anything, did he have to say, when he called on you at the penitentiary? A. He asked me not to make any remark about his being out there. He says, 'If you are asked the question, you can tell them I was your attorney in this adultery case;' that I would make that statement.

"Q. What did you say about it to him? A. I don't remember what answer I did make."

On his cross-examination he testified in part, and pertinent to the issue, as follows, viz.:

"Q. Did you not testify, in your direct examination, that your understanding was that you were pardoned out of the penitentiary to be a witness in the Borrego case, here, this morning? A. I said I supposed it was that.

"Q. Didn't you understand that that was the price of your testimony? A. I had no such promise.

"Q. Now, is it not true that when Mr. Catron came out to see you at the penitentiary, that he said to you that you ought not to testify to falsehoods against the Borregos, or words to that effect; that you had

told Charlie Spiess that your testimony against the Borregos was false, and that you ought not to testify again against them? A. I don't think he ever said that. I never told Mr. Spiess so at all.

"Q. Did he say anything of like substance? A. He said something to that effect. I told him I didn't testify to nothing that was untrue.

"Q. Didn't you then say to Mr. Catron that Mr. Spiess was your attorney at the time you made this statement to him, and that Mr. Spiess ought not to use it, and that it would get you into more trouble? A. I don't remember any such conversation.

"Q. Didn't you say that the use of this matter, that you told Mr. Spiess when he was your attorney, had the effect to get a more severe sentence on you in your adultery case? A. I don't think I did.

"Q. Didn't Mr. Catron then insist that you should tell the truth in the Borrego case, as he understood it; and didn't you say that if you did they would get you for perjury? Didn't you ask Mr. Catron, in the course of that conversation, that if you gave testimony upon the second trial different from that you gave in the first trial, if they could not get you for perjury? A. I did.

"Q. And didn't he tell you that they could? A. He told me that they could not, if I did what he told me to do.

"Q. Didn't he say that they could not if you testified that it would criminate you if you testified? Did he not put that distinctly on the ground that your testimony on the first trial was false? A. He tried to make it appear that way.

"Q. Wasn't that the way he talked to you all the way through? A. No, sir.

"Q. That your testimony on the first trial was false? A. He did not.

"Q. Did he at any time intimate to you that he believed the testimony you gave on the first trial was true? A. He intimated that it was not true.

"Q.  Didn't he insist that your testimony on the first trial was false, and that you knew it was false?  A. He didn't say that I knew it was false.

"Q.  Didn't he say to you, when you asked him if you gave testimony on the second trial that was different from that you gave on the first trial, that they could not get you for perjury?  Didn't he say that they could, unless you testified that your testimony would tend to criminate you?  A.  I asked him if I was going to make different evidence, if I did as he wanted me to do.  I said, 'If I did that, could they get me for perjury?'

"Q.  What did he say?  A.  He says, 'Answer the questions as I told you, and decline to answer the others.'

"Q.  That is, to decline on the ground that it would incriminate you, or tend to criminate you?  A. Yes, sir.

"Q.  He then said to you that if upon that trial you did decline to answer, upon the ground that your testimony would tend to criminate you, that he would protect you?  A.  Yes, sir.

"Q.  He made no suggestion to you upon that occasion that you should give any sort of testimony on the Borrego trial, did he?  A.  That I should give none; that I should give no evidence in the case.

"Q.  And he put that distinctly upon the ground that if you did testify to the truth, as he understood it, that you would lay yourself open to an indictment for perjury?  A.  I don't recollect that he did.

"Q.  Do you recollect that he did not?  A.  The way he said was, 'Now, if you go and testify in this case, you will be indicted for perjury, because these Borregos are liable to come clear, and then they will get you for perjury.'

"Q.  Didn't you ask him, Mr. Nowell, and have you not said that you did ask him, that if you gave

different testimony on the second trial from what you gave on the first trial, could they not get you for perjury? A. I did.

"Q. Didn't he tell you then to decline to answer, upon the ground that your answer would tend to criminate you? A. I don't recollect that he asked me that way.

"Q. Did he say anything like that? A. He told me if I answered these questions different from what I did before, they would get me for perjury. He says, 'You do as I tell you, and you will not be indicted for perjury,'—just about them words.

"Q. Didn't you ask Mr. Catron the question on that occasion, that if you gave different testimony on the second trial, if they could not use your testimony on the second trial, one against the other, for the purpose of indicting you for perjury? A. I did not."

In explanation of his visit to the penitentiary, and his version of the interview with the witness Nowell, respondent testified as a witness in his own behalf, on his direct and cross-examination, as follows, to wit:

"A. I heard Ike Nowell's testimony on the preliminary examination, and I heard the cross-examination of him by Mr. Spiess; and Mr. Spiess also informed me that, in a conversation with Ike Nowell, Ike had told him he knew nothing,—nothing tending to connect the boys, the Gonzales boys, in that case, with the killing of Francisco Chavez. Substantially his testimony was the same as what he testified here this morning himself. I said there was a possibility that Ike Nowell was to get a pardon, so that he might be brought on the stand to testify in that trial. I went to the penitentiary to see him and find out what his testimony would be; the circumstances being different, under which he was to testify here, to those under which he testified in the preliminary examination. At the time he testified in the preliminary examination he

had been convicted of the crime of adultery. His sentence was suspended in order that he might testify in that case, and he testified under the influences existing then as to the punishment that might be imposed upon him, as I understood it. Then I went to see what would be his attitude with reference to the two statements he had made,—the one to Mr. Spiess, as Mr. Spiess has represented, and the one in his testimony, they being diametrically opposed. I went to the penitentiary and requested to see him. He was brought into the room, and I spoke to him, and he said that he understood that I wanted to see him. I informed him that I had come to see him with reference to his testimony, in case he should be called as a witness in the Gonzales y Borrego case. I said to him that he had made, as I understood it, two different statements,—one on the stand as a witness in the preliminary hearing, and the other to Mr. Spiess, in regard to the connection of the Gonzales y Borrego boys with that killing,—and that they were contrary to each other, or conflicting with each other; that to Mr. Spiess he had said that he knew nothing to connect them with it, and in the other he stated facts which would tend to connect them. I asked him which of these two statements was true. He said the one he had made to Mr. Spiess was true. And then I said to him. 'If you are called on the stand, which are you going to testify to,—the one that is true or the one that is not true? He said that when he gave his testimony before the preliminary examination that he was in a 'close place' or 'tight place;' that he gave the testimony the way he did because he hoped it might influence the amount of punishment which would be placed on him, and help him in that regard; and Mr. Spiess having cross-examined him on that matter, and shown a different statement, he thought that the use of it in cross-examination had rather injured him, and caused a heavier pun-

ishment to be put on him. I said to him: 'Which are you going to testify to now, the truth or the untruth?' He remarked this way: 'I don't wish to do anybody any harm. I have had enough of this affair.' He said: 'If I go on the stand and testify to what I told Spiess,' he says, 'can't they use it against me in a prosecution against me for perjury?' I remarked to him: 'Certainly, if you testify differently from what you did before. One lot of your testimony can be used against the other,'—or words to that effect. 'But if you go on the stand you ought to tell the truth if you testify at all.' Then he says, 'How can I get out of telling what I said before if I tell the truth?' I said: 'You must not, if you go on the stand, tell anything but the truth. If the truth will help to convict you of perjury, why, there is only one way I see how you can get out of telling it; that is, that your answers will tend to criminate you. I must insist that if you go on the stand, that you tell the truth, if you testify to anything.' He said something, I think, about seeing me again, or something of that kind. I believe that is substantially what took place. I don't pretend it is literally the words.

"Q. State whether or not during that interview with Nowell you endeavored to persuade him to change his testimony on the approaching trial, in any other manner than what you have now described? A. I did not."

Cross-examination: "Q. When you went to the penitentiary to see Ike Nowell, how did you go, Mr. Catron? A. I went in a buggy.

"Q. Who went with you? A. Gus O'Brien.

"Q. What direction did you go? A. We went up this street that goes in front of the Cathedral, turned down, and went across what is called the 'San Miguel Bridge,' there in front of the San Miguel College, and took a cross street.

"Q. That is not the usual route to the penitentiary, is it? A. I don't know that it is the usual one. It is the one I took on that occasion.

"Q. You knew as a matter of fact, before you went, that Ike Nowell had already been pardoned? A. No, I didn't know.

"Q. Hadn't you understood that the pardon had actually been granted? A. No.

"Q. Didn't you state to him while you were there that he had been pardoned? A. I may have stated that Col. Bergmann had informed me that he had received a telegram that he had been pardoned.

"Q. The conversation was entirely private? A. Yes, sir.

"Q. You had cross-examined Ike Nowell on the witness stand on the preliminary examination,—he had testified, hadn't he? A. I had examined him partly in regard to that matter. I think I examined him in part, but not with reference to his connection with the Borrego matter.

"Q. But it was taken down in shorthand, and written out for the purpose of being used on the Borrego trial? A. I understand it was.

"Q. You had read it, hadn't you? A. I don't know whether I had or not. I was present when the cross-examination took place.

"Q. You talked with Mr. Spiess fully as to what Mr. Spiess claimed had been that conversation between him and Nowell prior to the preliminary examination? A. Yes, sir.

"Q. Pointed and direct questions had been directed to Nowell on that preliminary examination? A. I think so.

"Q. And he answered positively that he had no such conversation with Mr. Spiess? A. My recollection is, in a general way, that he denied substantially that he had any such conversation with Mr. Spiess. As to whether he denied specifically, I don't know.

"Q. Had Mr. Spiess taken the witness stand and contradicted Mr. Nowell on the preliminary examination? A. If he did, I don't know. I wasn't there.

"Q. When you went to the penitentiary you knew that, didn't you? A. If Mr. Spiess testified, he testified when I was not there.

"Q. You knew that Mr. Spiess claimed Nowell had been put on to testify, and was asked about the conversation with Spiess? A. Yes, I knew that.

"Q. You knew that, from Mr. Spiess himself, that he would take the witness stand, and contradict the testimony of Ike Nowell, if he testified in the main trial? A. Before, in the preliminary examination, I supposed he would.

"Q. As a matter of fact he did take the witness stand on the main trial, and contradicted Nowell? A. I think he did, but I am not positive about that."

A careful comparison of the testimony of respondent with that of Nowell will disclose a substantial variance in two or three important particulars only. Respondent testified: "I said to him that he had made, as I understood it, two different statements,—one on the stand as a witness in the preliminary hearing, and the other to Mr. Spiess, in regard to the connection of the Gonzales y Borrego boys with that killing,—and that they were contrary to each other, or conflicting with each other; that to Mr. Spiess he had said that he knew nothing to connect them with it, and in the other he stated facts which would tend to connect them. I asked him which of these two statements was true. He said the one he had made to Mr. Spiess was true. And then I said to him, 'If you are called on the stand, which are you going to testify to, the one that is true or the one that is not true?'" Then he gives his version of Nowell's reply, and again repeats to the witness, "Which are you going to testify to now; the truth or the untruth?" These are the only sub-

stantial contradictions of Nowell. In answer to the last question on his examination in chief, "Did you endeavor to persuade him to change his testimony on the approaching trial in any other manner than you have now described?" he said, "I did not." Nowell, in answer to the question, "He made no suggestion to you upon that occasion that you should give any sort of testimony, on the Borrego trial, did he?" says, "That I should give none; that I should give no evidence in the case." Nowell is, it appears, corroborated in many important particulars by the respondent's own statements, and he stands uncontradicted in the following answers, to wit: In answer to the question, "What did he [respondent] say?" Answer: "He said, 'Answer the questions as I have told you, and decline to answer the others.'" And then, after the question if that was not put distinctly on the ground that if he testified to the truth, as respondent understood it, that witness would lay himself open to an indictment for perjury, witness said: "I don't recollect that he did. * * * The way he said it was, 'Now, if you go and testify in this case, you will be indicted for perjury, because these Borregos are liable to come clear, and then they will get you for perjury.'" And again, to the question, "Didn't he tell you then to decline to answer, upon the ground that your answer would tend to criminate you?" This answer is: "He told me, if I answered these questions different from what I did before, they would get me for perjury. He says, 'You do as I tell you, and you will not be indicted for perjury,'—just about them words." And to the question, "What, if anything, did he have to say, when he called on you at the penitentiary?" This answer is: "He asked me not to make any remarks about his being out there. He says, 'If you are asked the question, you can tell them I was your attorney in this adultery case;' that I should

make that statement." These are material parts of the testimony, and stand as true, if the witness is worthy of belief.

But there is still another phase in this witness' testimony. It was well known that his evidence was considered very damaging to respondent's case, and much interest and anxiety was displayed concerning him and his whereabouts. The hearing of these charges was set the first time for the seventh day of October last, and it was a notorious fact that Nowell had left the territory, and gone to Trinidad, Colorado. The committee secured a subpoena for his appearance and that of other witnesses then at Trinidad on the day set for the hearing, and directed it to be served by the United States marshal for that state; and about the first of October one Page B. Otero, who, up to a few days prior to that time, had been one of the most efficient and active officers of the county in securing testimony against the Borregos as one of sheriff Cunningham's deputies, and one of the posse which was compelled to kill Vigil while resisting the arrest, secured a loan of $50 from the respondent, boarded the train the same day and went to Trinidad, and there had an interview with Nowell and the other witnesses about this case, and advised Nowell to disobey the subpoena, and offered to give him sufficient money to pay his railroad expenses to Texas, and offered to secure legal advice in Trinidad to convince him that he need not come on the subpoena issued by this court, and said to witness: "I understand you are subpoenaed in the case of Catron and Spiess, and you need not answer that subpoena. I saw the lawyer, and also telegram from the old man,"—who the witness supposed to mean the respondent; and said to the witness, "If you don't want to answer this subpoena, just keep out of the way until Cunningham leaves town." Witness further says: "His business up there was to

see me." He says, "We don't want you to appear;" "that if he [witness] did come, he would get the worst of it;" and that "we have all the other witnesses fixed;" and that he (Otero) asked witness to write a letter to district attorney Crist, and explain that he (witness) was drunk when he testified, and to give him (Otero) a copy of the letter, etc. Otero contradicts substantially all this conversation, but Nowell's statement bears the stamp of truthfulness more than does Otero's contradictory statements; and Otero returned to Santa Fe on the same train with Nowell and other witnesses for the prosecution. The telegram referred to by Otero is in evidence, and is as follows, to wit:

"TRINIDAD, COLO., Oct. 4th, '95.
"T. B. CATRON, SANTA FE, N. M.:

"Has clerk of our supreme court power to issue subpoena in proceedings against you for witness residing in Colorado? If so, how must service be made? Wire full instructions.

"[Signed]                P. B. OTERO."

To this telegram the following reply was sent:

"SANTA FE, Oct. 4th, 1895.
"P. B. OTERO, TRINIDAD, COLO.:

"Clerk of the supreme court has no right to issue subpoena to run into Colorado. No one is authorized to serve such; and it is void.

"[Signed.]    T. B. CATRON, Ch. T. B. C."

These telegrams are sufficient to support, in substance, Nowell's testimony as to the conversation he had with Otero in Trinidad, if he needed any support, as against Otero. The respondent testifies positively that he had no previous understanding with Otero in reference to his mission to Trinidad, and did not know at that time that Nowell was there; and that he made Otero the loan as a mere matter of business accommodation; and that he did not know that the witness referred to in the telegram meant Nowell. The proof

also shows that other friends of the respondent approached Nowell on the streets and in saloons, after his return to Santa Fe, and warned him not to testify against respondent, but there is nothing to show that respondent authorized or knew anything about his friends approaching the witness.

The second specification refers to the witness Porfilia Martinez de Strong. This witness gave testimony in the Borrego case, on the preliminary examination, which would, if true, have impeached and completely destroyed that given by Luis Gonzales, a very material witness for the prosecution; and at the trial on the indictment, she again gave, in her examination in chief, substantially the same, but was not then cross-examined by the prosecution, but returned in a day or so afterward,—as she testifies, of her own volition,—took the witness stand, and stated that all she had previously sworn to at the preliminary hearing and on her examination in chief at the trial a day or so before was false, and that she had been so induced to give false testimony through fear and intimidation. If the testimony of this witness alone was to be weighed in the balance as against that of the respondent, it would be an idle use of time to consider it; but there are circumstances connected with and surrounding this part of the case which can not in justice to the subject be passed over unnoticed. When the time came for her appearance in the trial, one Fred Thayer, whose occupation has not been clearly defined, went to the witness' home, in the nighttime, some eighteen miles from Santa Fe, and read to her what she seems to have understood as a warrant for her arrest, but which in reality appears to have been a subpoena, put her on the train, brought her to Santa Fe about 12 o'clock at night, and, instead of taking her to the home of a friend or to a public hotel, lodged her in the private office of the respondent, and furnished her a bed, where she passed the

remainder of the night, and where said Thayer furnished her with her meals, and where she remained all the time except while at the courthouse as a witness. But respondent says, in his testimony, that this was done without his knowledge or consent, and I do not think there is anything to show to the contrary. I do believe, however, that she was induced to give false testimony, and that she gave it through fear and intimidation, but not through the advice, knowledge, or consent of respondent, but through the aiders and abettors of the said four defendants.

But, during the pendency of these charges, the testimony shows, the respondent drew up a long typewritten affidavit, stating, in substance, that all that this witness had testified to at the preliminary hearing and in her testimony in chief on the trial was true, and that all she had testified to on her cross-examination on the trial was false, and that she had been so induced to testify falsely through intimidation and fear, and gave the same to one Roman Garcia, a friend to his clients, and sufficient money for his proper expenses, and told him to have her sign and swear to it, and then return it to him, the respondent. Afterward this affidavit fell into the hands of the prosecution. That witness (Garcia) testifies as follows, to wit: "I went to the office, and he [respondent] was there, and he took me into another room, where he and I were alone; and he asked me if I could go to Lamy and speak to Porfilia [the witness], and I told him I could. He said, 'don't go to-day, because I am afraid Cunningham is around there; and when you do go, be careful of Pedro Carriaga. Come to my office about 4 o'clock in the afternoon.' I went about 5 o'clock. My father was there with me. He asked me again if I wanted to go. I told him I did. Then he took me into another room, where Bob Gortner was, and he commenced to prepare that paper [the unsigned affidavit]. He then said, 'here is

this paper; translate it into Spanish, and bring me the English.' Then he said to me that I was in danger of being put in the penitentiary. He gave me the paper, but didn't say anything more to me. I left the office, and afterward returned and asked him when I should go. He told me to go about 9 or 10 o'clock, to his house. The following day (Sunday) I went to his house, and found him. He pulled out five dollars, and gave them to me, and told me to go and endeavor to get Porfilia to sign that paper. That is all that occurred that day."

"Q. Did Mr. Catron give you any instructions as to what efforts you should make to obtain the signature of Porfilia Martinez de Strong? A. That is all he told me—to try and get Porfilia to sign the paper.

"Q. State whether or not, when Mr. Catron gave you this paper which I showed you a while ago, he gave you instructions as to the length of time you should remain down there in the getting of this affidavit, if necessary. A. All he said to me was that I could stay two, or three, or four days."

It appears that Garcia did not go to Lamy, or take any steps to procure the signature of the witness to the affidavit, and that on a subsequent day he was called to the office of respondent; and he says, "Mr. Catron asked me where the paper [affidavit] was. I told him that Messrs. Cunningham and Crist had it. Then he asked me if I had promised to state anything in court. I told him I had not." Two or three days before the witness testified, he says he was again sent for, and went to the office of respondent, and learned that he was at the hospital at dinner; and an employee in the office took him there, and that respondent "said to me, what was I going to testify in the court? If I wasn't going to state that I had promised the affidavit of Porfilia; if I didn't state to him that I would go and see Porfilia and get her to sign that? I told him yes. Then

he said, 'you be careful of what you are stating before Gus.'"

"Q. What did Mr. Catron say to you when he first came into the parlor? A. I am not sure what he said to me first; but he said, 'is it not true that you promised me Porfilia's affidavit or oath?' That is what he said,—and if I was going to testify to that? And I told him yes.

"Q. State whether or not it was true that you had promised Mr. Catron Porfilia's affidavit. A. Never.

"Q. State why you made the statement which you have just made, to Mr. Catron. A. In order not to delay any longer there.     *     *     *

"Q. State whether or not, prior to the time that you went into Mr. Catron's office, when you went to get that affidavit and since the trial of the Borrego case, you had any conversation with Porfilia Martinez de Strong in regard to her testimony. A. No, sir.

"Q. State whether or not you had had any conversation with Mr. Catron, in regard to the testimony of Porfilia Martinez de Strong, prior to the time he called you into his office and wanted you to get Porfilia to sign that affidavit. A. I have had no more conversation than what I have stated."

This witness seems to be a young man of excellent reputation, and his testimony is uncontradicted in every particular, except by the respondent, and he testified that he and his father are close personal and political friends of the respondent. In reply and explanation to this testimony, the respondent testifies as follows, to wit: "The father of Roman Garcia and some other gentlemen—I don't remember now who—came to me, and informed me that this woman had been induced, as they understood, to change her testimony by a promise to release her from jail, and stated that she had been brought back at the time she came back and was cross-examined,—that she had been

brought back on a warrant for a violation of a city ordinance, and that she had been released from jail on a promise that if she would give testimony they would not enforce that warrant against her, and that she was willing, as they said, to make an affidavit to that effect, and also to a contrary effect of what she had testified to before the examination, wherein it differed from the other examinations. They suggested to me that if I prepared an affidavit to that effect they could send it down and have it signed. I prepared an affidavit to that effect, a copy of which, the original of which I dictated to Mr. Gortner. I saw it in the newspaper. I don't know whether it has been offered in evidence yet or not. I prepared that. Then Mr. Garcia said his son would go down and get it signed, as he was acquainted with her. I told him to come with his son to receive the copy of the affidavit. He came there in person, and I delivered the affidavit to his son, in his presence, stating to the son to explain this affidavit to this woman,—translate it into Spanish (he said he understood English well enough to do so), so that she could thoroughly understand it. If she said it was true, to have her sign it. If she said it was not true, 'don't get it signed, but bring it back to me.' He said he had no means of paying expenses, and that the woman might be away from Cerrillos, and I gave him five dollars to pay his expenses while he was gone to get that affidavit. I expressly said to him that he must not offer her any inducement in the world, nor make any promises to her, and that the affidavit must be entirely voluntarily given, and what she said must be true, and that no influence, no efforts, and no promises must be used to get her to make the affidavit."

The third specification relates to the testimony of one Max Knodt, who gave very positive and important testimony against the defendants in the Borrego case, on the preliminary hearing, before Judge Seeds. On

this hearing, this witness gave strong and damaging
evidence, which tended directly to connect the defend-
ants with the killing of said Chavez,—that he had seen
and recognized some of the defendants going in the
direction of the place of the homicide, only about half
an hour or so before the assassination occurred; and he
was consequently regarded as a most important witness
for the prosecution, especially as he appeared, in the
preliminary examination, to be an honest and disinter-
ested witness. Just prior to the trial on the indictment,
he suddenly became very reticent, and talked with
much reluctance to the prosecuting attorney about the
facts he had previously testified to, and on the witness
stand at the trial his memory finally slipped from un-
der him, and his testimony became valueless to the
prosecution. It was then discovered that the respond-
ent had procured a pass for him over the railroad from
Santa Fe to Gallup and return, and the following letter,
after many efforts by the prosecution to obtain it, was
offered to sustain the charges by the prosecution:

"SANTA FE, NEW MEXICO, May 10, 1895.
"HON. C. N. STERRY—

"DEAR SIR: I am compelled to either go or send
an agent out to Gallup, on some business of my own.
I am tied up at present in the trial of the alleged
Francisco Chavez murder case and can not get off,
while the business I have out there is urgent, and I
must send an agent to represent me. Will you kindly
do me the favor to send me a pass for Max Knodt
from Albuquerque to Gallup and return, good for
30 days? I will deem this a favor, which I will be
glad at some time to reciprocate.
"Very truly, &c.,
"T. B. CATRON, Att'y for S. P. R. R. Co.
"HON. C. N. STERRY, Genl. Counsel,
Albuquerque, N. M."

The respondent gives the following explanation of his connection with this matter, to wit:

"Q. State whether or not the procurement of the pass for him has any reference to the trial of the Borregos. A. None in the world. Mr. Knodt came to me and stated that he wanted to go to Fort Wingate to see a girl who had formerly been in my employ, with whom he had got acquainted while she was living in my house (she was cooking for me), and asked me if I could not procure him a pass. I informed him that for such a purpose as that I did not think I could secure him any, and I said, 'I have some business which will call me to Gallup, and if you can possibly attend to it,—it is to get some papers from a party in Gallup to whom I had been writing,—and if you will go on and attend to that for me, I can represent that you are going on business for me, as I will have to go myself, otherwise; I can't get it on that ground for you.' He said he would be willing to go on and attend to it, so I wrote a letter to Capt. Sterry asking a pass for him, stating that I wanted him to go to Gallup and attend to some business for me. I didn't hear from that letter at all. That letter was written some time in May,—I think the tenth of May. I didn't hear from the letter until some time in June, when I received a letter from Mr. Sterry stating that he had been absent from Albuquerque when my letter came, and asking me whether I still desired him to send the pass, and I answered the letter which has been given in evidence, I think dated June 4, and after that the pass was sent to me, and turned over to Max Knodt. There was only one pass obtained." This is indeed a most remarkable coincident,—that this man's memory should remain so perfect and retentive at the preliminary hearing, which occurred nearly two years after the homicide, and then, in a little more than a year after that hearing, and after it had been

refreshed by a rigid cross-examination under oath, it should fail him, and that, too, at just about the time when respondent says witness applied to him for his influence to assist him in securing the pass, and who was one of the attorneys who cross-examined him in the preliminary hearing. That this witness was "tampered" with there can not be a shadow of a doubt. But it is not here contended that respondent did it, because he swears positively that he did not, but as to whether it was done with his advise, knowledge, or consent the record does not disclose. But the idea that the respondent constituted Max Knodt, at that particular time and under the peculiar circumstances, his authorized agent to go to Gallup and "get some papers from a party" there, which he said he had been unable to obtain through correspondence (but which it appears he did obtain in that manner), is a subterfuge of the most transparent character; and it is but due respondent to say that he has too much respect for this court to expect it to give one minute's serious consideration to such a statement; else why did he fail to show authority in Knodt to receive "the papers?" why did he fail to give the name of "the party at Gallup?" These matters could have been shown, if the statement was true about the agency. He was simply driven, for an explanation of the "pass transaction," to the old maxim that "necessity is the mother of invention."

The fourth specification charges, in effect, that the respondent offered one Rosalia Gonzales y Baca money, and otherwise tried to induce her to secure of her two sons, Luis and Mauricio Gonzales, affidavits which, in effect, would destroy their testimony in the then approaching trial of the Borrego case, on the indictment; both said Luis and Mauricio being very important and material witnesses for the prosecution in that case, and the said Luis having testified at the preliminary hearing, and said Mauricio being subpoenaed,

but was not called as a witness. That part of the testimony of this woman pertinent is as follows, to wit: "Q. Just tell what happened. A. I was going to church, when he [respondent] knocked at the window, and motioned this way, and told me to come upstairs. I went upstairs, where he was, and he inquired of me what I was doing with reference to the record or pension of my husband. I told him I was making an effort to get the reward, and would pay him the money when that came. He said no, that all he wanted was that Luis and Mauricio should come and make a declaration in favor of the Gonzales y Borregos. I told him that I didn't command my children. I told him that I would not meddle in my sons' affairs; that I didn't command them. Then he told me not to say anything to Luis or Mauricio. Then he said to me that he could give me money if I desired; that he could aid me whenever I was in need, if I so desired. That is what he said to me."

The respondent's testimony on that point is as follows, to wit:

"Q. If you had any interview with her in your office in connection with any other business, state the particulars of it. A. I had an interview in my office with her, two of them. She came up to my office with her son Catalino, and represented that her husband had been a soldier during the war, and she had made application for a pension. Mr. Read, she said, was her agent and attorney, and would like for me to aid her so far as I could, as delegate to congress. I interrogated her as to her husband's being connected with the army. I knew her husband, had known him during his lifetime, and as far as I could get from her the character of pension she had applied for, judging from what she said, it was under the dependent pension act. I said to her, 'I will write a letter to the commissioner of pensions.' She said the application

had been made a long time, and was being delayed,
and that she could not hear from him, but she would
like for me to write and hurry it up as soon as
possible.''

And says he did not in any way attempt to induce
her to secure the affidavits of her two sons, Luis and
Mauricio, in favor of the Borregos.

The fifth and last specification is to the effect that
the respondent offered said Mauricio Gonzales money,
and otherwise attempted to induce him to make an
affidavit that he was not at or near the place of the
killing of said Chavez, during the night that the homi-
cide occurred.   To sustain this charge the said Mauri-
cio was offered as a witness, and he first testified, in
substance, to the effect that he was called to the office
of respondent, and there offered money and otherwise
induced to make such an affidavit, as alleged, but that
he had declined to do so.   The respondent then offered
in evidence, for the purpose of contradiction, and to
destroy the testimony of the witnesses, the following
affidavit, to wit:

''Territory of New Mexico, County of Santa Fe.
Mauricio Gonzales, being first duly sworn, upon his
oath says that he is twenty-three years of age; that he
is a resident of Santa Fe county, and has been all his
life; that he is a brother of Luis Gonzales, also a resi-
dent of said county of Santa Fe, and that he remem-
bers the night on which the late Francisco Chavez was
shot and killed, at or near the Guadalupe bridge, said
Francisco Chavez being the same man who had form-
erly been sheriff of Santa Fe county; that on that
night he came from his house to the plaza of Santa Fe,
about 6 o'clock, when he returned to his home,
being a house of the same Francisco Chavez, on the
north side of the Santa Fe river, near the house of Mr.
Schormeyer, and in the same square or block with the
house of Mr. Schormeyer, and remained there the

whole of the night, and did not further go out. ' He further states that at no time on the night when Francisco Chavez was killed did he cross the Guadalupe bridge with his brother Luis; that he was not on the Guadalupe bridge during the whole of that night, or nearer to it than two hundred yards or more; that he did not hear any shots fired, nor was he where he could see, nor did he see, any persons at or near the south end of the Guadalupe bridge, armed or otherwise, nor did he go by such place, any time during the night, with his brother Luis; that if his said brother Luis has stated that he was with him on that night at any time, or that he crossed that bridge with him, or that they saw any men standing near the south end of the bridge, or that any shots were fired in the presence or hearing of affiant, at or near said bridge, he is entirely mistaken, as affiant was nowhere near that place at any time during that night; nor was he at any time during that night in company with his brother Luis; and that he never at any time saw any of the defendants, Francisco Gonzales y Borrego, Antonio Gonzales y Borrego, Patricio Valencia, or Lauriano Alarid, at or near the south end of said bridge, standing there, either on a level with the bridge, or down on either side of it; that he never at any time heard any shots fired at or near said bridge, and never at any time crossed said bridge with his brother in the nighttime; that he knows nothing whatever about the killing of Francisco Chavez, or who was connected with the killing; nor does he know of any fact which cast suspicion upon anyone as to who killed said Francisco Chavez, or as to what the facts of his killing were. · Affiant further states that he makes this affidavit freely and voluntarily, and without any threats or compulsion whatever, and without any reward or offer of reward or hope of reward for the same; that he does it without any consideration

whatever, and uninfluenced by anything except a desire to tell the truth.

his

"MAURICIO X GONZALES.

mark

"Subscribed and sworn to before me, this 1st day of October, A. D. 1895.

"WILLIAM E. GRIFFIN,

"Notary Public.   [SEAL]

"Witnesses to signature:

"CLARENCE KEY,

"R. C. GORTNER."

The witness in the afternoon returned into court, and asked leave to again go upon the stand for the purpose of correcting his testimony given by him in the forenoon, and was then permitted to so do; and upon the witness stand stated that he so returned of his own volition, and without advice from anyone, and on being shown the affidavit admitted that he did sign and swear to it. He then stated that, when he was called to the office of respondent, the respondent directed his clerk to prepare a paper of some kind, as he understood him to say, and to have witness sign and swear to it; that the respondent then left the office, and witness remained until the same was prepared and presented to him; that he signed it, but that it was not read to him in Spanish, and that he (witness) understood very little or no English, and that he did not understand the purport and contents of the same. Respondent replied to this as follows, to wit: "I had been absent from Santa Fe just prior to the first day of October, some days, and I came to the office on the morning of the first of October, and Gus O'Brien, who is the office boy for me, informed me that this Mauricio Gonzales had been at the office two or three times, stating that he wanted to make an affidavit that Luis Gonzales' testimony was false, as he gave it on the preliminary examination. I said to him, 'If he wants to make it; all right,' and he

said that Mauricio wanted to see me to get me to draw
it up. I told him if he saw him to tell him to come
up, and I would talk with him about it. A short time
afterward, during the day, he came up with O'Brien,
and O'Brien said, 'There is Mauricio,' and that he
wanted to talk with me about the testimony of Luis .
Gonzales. · I asked him what he wanted to say, and
asked him several questions, and he gave me the facts
as set out in that affidavit, and he stated that he wanted
to make an affidavit as to those facts, and asked me to
write it out for him. I wrote it in pencil, and handed
it over to Mr. Gortner, my stenographer, and asked him
to have it typewritten, and I said, 'When you have it
written, have Mr. Key to translate it to him in Spanish,
and get someone to swear him to it, if he says it is true,
and wants to swear to it.' I was not there when he
swore to it, and was not there when it was translated
to him. That is all that occurred while I was there. I
went out of the office, and when I came back into the
office they told me it had been translated to him, and
that he had sworn to it, and showed it to me."

This woman Rosalia Gonzales y Baca, it appears
from the record, had three sons, Catalino, Luis, and
Mauricio, all of whom were subpoenaed as witnesses for
the prosecution at the preliminary examination, and at
which Catalino and Luis testified to very damaging facts
against the defendants, but to a different state of facts
which occurred at different times and places, but Mau-
ricio was not called, because it appeared in this proceed-
ing that he, at the time of the preliminary examination
was going on, was arrested by the city marshal, brother
of one of the defendants, charged with having a deadly
weapon on his person, and was confined in the city jail,
was fined, appealed to the district court, where he was
again found guilty, and sentenced to serve his sentence
in the jail, and was so confined and serving out his
sentence when the Borrego case was tried on the indict-

ment. To show the importance of the testimony of said Luis, the following is taken from the testimony of respondent, on cross-examination in this case, to wit:

"Q. Mr. Catron, on the trial of this Borrego case, this man Luis Gonzales was the most important witness for the territory, wasn't he? A. I think not.

"Q. Wasn't he the only witness introduced by the territory on the trial of the case who testified that he saw these defendants near the place,—near the bridge where the shots were fired,—and that he heard the shots? A. No.

"Q. What other witness so testified? A. Francisco Rivera, in my opinion, was a much more important witness for the territory. Francisco Rivera didn't say he saw the shots, but that he saw the defendants at that place. He testified that he saw the defendants there about half an hour before he heard the shots, something like that. This man Luis Gonzales testified on both trials that he was within comparatively a short distance from the bridge, when the shots were fired, and heard them.

"Q. Was there any other witness on that case that gave direct, positive evidence, so as to prove their presence, and identify them with the shots? A. I think Rivera gave better testimony than he did, as to identifying the parties. There were other people that testified as to the shots, fully as well as Luis Gonzales. There was no witness that testified as to both facts.

"Q. Luis Gonzales testified as to both facts, didn't he? A. Yes.

"Q. And he put the defendants closer, in point of time, to the shots and to the place where the shots were fired, than any other witness? A. I don't know that I understand you. He put himself closer, in point of time of firing the shots, than Francisco Rivera did, but there was some other witnesses that saw the shots fired,

and were fully as close as he was. I think a man named Hogle was one.

"Q. This witness didn't see the defendants? A. No, he didn't pretend to.

"Q. The testimony of Luis Gonzales was that they (Luis and his brother Mauricio) saw the defendants, and passed on some five or six hundred feet, and saw the shots? A. Something of that kind.

"Q. And that he spoke to one of the defendants, Hipolito Vigil, the one that was killed, one of the accused, at the end of the bridge, as he came across? A. He said he spoke to Hipolito at a little acequia.

"Q. Close to the place? A. A short distance from them.

"Q. The evidence on the part of the territory tended to show that the shots were actually fired by the two Borregos and Hipolito Vigil? A. There was some testimony to that effect. There was no evidence that I remember, on the part of the territory, that limited it in that way. The evidence, so far as I remember, tended to show that the parties who were standing near the end of the bridge, the two Borregos, Hipolito Vigil, Chino Alarid, and Patricio Valencia. It was in evidence that Chino Alarid had gone down town at the time the shots were fired. The evidence of these men that pretended they saw him there was some evidence that he had gone down town. The testimony as to his presence there was that he had seen him there about half an hour before,— the testimony of Luis Gonzales that he had seen him there. My recollection is that he said,—the testimony was, I think, he said,— he saw about five of them there. I don't pretend to remember all that testimony minutely. That is all.

"Q. Is it not a fact that Patricio Valencia wanted to get a severance,—to have a separate trial? A. Yes, his father stated he did.

"Q. Didn't you oppose that? Hadn't he already employed Ben Read to defend him? A. I don't know.

"Q. Didn't you object to Mr. Read's being associated with you in the trial? A. Mr. Read suggested that some of these defendants wanted to employ him, but I suggested that if they had any money they had better give it to me.

"Q. Did you defend the defendants without compensation? A. Yes, I have a promise of compensation; but I defended them without any."

It will be seen from this that the influence of this woman, the mother of three important witnesses, who either had given or was known to be in possession of material and damaging testimony against the accused, was a matter of vital and important consideration to the defendants and their counsel; and it may be construed as strong corroborative circumstances to strengthen the testimony of the woman Rosalia Gonzales y Baca.

The court hearing this case sat as a jury, saw the witnesses, heard them testify, and observed their manner and conduct while upon the stand, and, as a jury, passed upon and considered all the facts and circumstances as they developed before the court. And in recording this dissenting opinion, as the dissent must largely rest upon the facts, I have endeavored faithfully to extract and incorporate into this opinion only such parts of the testimony as will give a fair and impartial understanding of the case, and of all the surrounding facts and circumstances influencing it, in so far as it is thought proper, without becoming too unreasonably prolix, and to show, in so far as possible, in a calm and dispassionate manner, reasons for refusing to concur with the majority of the court. It is admitted in the majority opinion of the court "that if we are to credit the whole of the testimony of the witness Nowell, then this part of the charge is established, as Nowell states that the respondent, Catron, came to the penitentiary and had a talk with him, in which the

respondent, Catron, told him, the witness, in substance, that he, Catron, did not want him, the witness, to testify as he had done before. * * *'' It is true that the respondent testified that he went there for the purpose of ascertaining from the witness which of the statements were true,—the one his partner, Spiess, told him the witness had made, or the one he swore to on the preliminary examination; but does his own statements sustain this position, or his purpose? I think not. Nowell swears that respondent told him, "Answer the questions as I told you, and decline to answer the others," and, "Now if you go on and testify in this case, you will be indicted for perjury, because these Borregos are liable to come clear, and then they will get you for perjury;" and again he testified that respondent "told me if I answered these questions different from what I did before they would get me for perjury. He says, 'You do as I tell you, and you will not be indicted for perjury.'" Neither of these statements are in terms denied by the respondent. He bases his denial entirely on the ground that the testimony previously given was false, "as he understood it,"—and this, too, after the witness says he told respondent that he had told the truth. Respondent offered to defend witness if he got into trouble, and this is not denied, and the whole burden of the examination of respondent's counsel was to the effect that witness should on the approaching trial testify to the truth as he (respondent) " understood it." The only real and substantial and pointed contradiction is that witness says he told respondent that he had testified to nothing but the truth, while respondent swears that witness told him just the contrary. There are many other facts and circumstances corroborating Nowell, which will hereafter be discussed.

The testimony shows that the witness Porfilia Martinez de Strong, or what she would swear to, was first

brought to the attention of respondent by Charles M. Conklin, who was, at the time of the killing, and for some time thereafter, the sheriff of the county, and that he caused the witness to be brought to Santa Fe for the preliminary hearing, and took her to his private house, and there kept her, and, she swears, told her what she must swear to at that examination. Then she was brought again to Santa Fe, in the nighttime, under arrest, as she states, by one Thayer, taken directly to a private office of respondent, kept there the remainder of the night, all the next day, except while being examined in chief, and until nighttime, and her meals brought to her by said Thayer, when she was put into a carriage and sent to the train, and sent back to her home at Lamy,—and all at the cost and expense of respondent; that a day or two thereafter she voluntarily returned, sought the district attorney, and requested to be recalled that she might retract her testimony given at the preliminary hearing and at the trial; that, pending these charges, respondent prepared a long affidavit contradicting all she had said on her cross-examination, employed the son of a close personal and political friend of his, gave him the necessary funds, and directed him to go to her house at Lamy and secure her signature to it; that this witness is very ignorant, understands little or no English, can neither read nor write her own language, a widow, the mother of children, very poor, friendless, and possessed of a bad moral reputation. With reference to the testimony of Rosalia Gonzales y Baca, it is corroborated only to this extent; that it is shown that her three sons were all very important witnesses for the prosecution; and while her testimony alone could not stand as against that of the respondent, yet it is shown that respondent did procure the affidavit of her son Mauricio, and that, too, to the exact purpose and effect that his mother swears that she was asked to do; and

in one of the charges' against the respondent Spiess,
tried as a part of this case, the said Luis testified posi-
tively that respondent Spiess had him called to the
office, and wrote out a bank check for $10, and offered
it to him if he would make an affidavit similar to that
made by Mauricio, and that the whole transaction was
in the presence of Gus O'Brien.    Mr. Spiess positively
contradicts this by his testimony, but he failed to put
O'Brien on the stand to corroborate his testimony and
contradict that of Luis, which would have been an easy
matter, and a very strong and proper thing to have
done.

In order to understand more clearly the important
facts these witnesses testified to on the preliminary
hearing, I will state them briefly.   Nowell testified that
he saw the two Borregos about six hundred feet from,
and going in the direction of, the place of the killing,
about three quarters of an hour before the killing
occurred, and that he again saw them going in a direc-
tion from the place, about a quarter of a mile distant
from the place, about half an hour after the killing,
and that he saw and recognized them.   Max Knodt
testified that he saw and recognized the said Francisco,
with two others, filling completely the description of
said Antonio and said Alarid, about three hundred
yards from, and going in the direction of, the place,
about three quarters of an hour before the killing
occurred.   Luis Gonzales testified that he and his
brother, Mauricio Gonzales, crossed the said bridge a
few minutes before the killing occurred, and just
beyond it, a few steps, saw, recognized and spoke to
said Hipolito Vigil, and saw with him another man,
and that he and his brother passed on about two hun-
dred yards further south, stopped, and heard the fatal
shots fired, and saw the flash from the guns.   The wit-
ness Porfilia Martinez de Strong testified that Luis
Gonzales lived, at that time, in the same house with

her and her husband, who was then alive, and that, at
the very time of the killing, the said Luis was in bed
in an adjoining room to her, and that a man came and
rapped on the door, and that she saw said Luis get up
and answer the call, in his night clothes, and heard the
man on the outside tell him that "Chavez had been
killed on the bridge." The testimony of the witnesses
Nowell, Knodt and Luis and Mauricio Gonzales com-
pletely destroyed the alibi, as set up by the defendants;
and if this evidence was untrue, or if the jury had
disbelieved them, and believed the testimony offered to
impeach their moral characters and their standing for
truth and veracity, then the alibi would have been sus-
tained, and the defendants acquitted, because these
were the only witnesses who testified that they saw the
defendants within the locality of the place of the kill-
ing at any time within three hours of the time it took
place, except Francisco Rivera. But his testimony,
standing alone, would hardly have warranted a verdict
of guilty, because it was shown that he was, to some
extent, an accessory before the fact to the conspiracy
to commit the crime. It is but natural, then, that the
defendants and their counsel would be very much inter-
ested in these witnesses and their testimony; and it
clearly shows the motives for obtaining affidavits from
all of them that it was possible, and for the efforts
used to break down and destroy the others by impeach-
ment and otherwise.

But it is contended by counsel for the respondent
that all these witnesses are of bad moral character, and
that their standing for truth and veracity is bad, and
that they are unworthy of belief; and the majority of
the court has sustained that view of the case. To sus-
tain this contention, respondent offered a number of
witnesses, who testified that Nowell was a man of bad
moral character, because he had been indicted and
convicted of adultery, and that his standing for truth

and veracity was bad, and that they would not believe
him on oath.  Almost to a man, these witnesses were
strong partisans, and favor seekers of the respondent,
and were unable to show that Nowell had ever been
charged with a violation of the law, though a resident
of this county for a number of years, except in the
adultery "incident," and that because he was a hack
driver, and sometimes drank too much whisky; and
the only reason they could give why he was unworthy
of belief was because they would not believe him.
The prosecution offered about the same number of
equally respectable witnesses, who testified that they
had known him for a number of years, and never heard
of him violating the law, except in the adultery "inci-
dent," that his standing for truth and veracity was
good, and that they would believe him on oath.  Re-
spondent offered a number of witnesses who testified
that the woman, Porfilia Martinez de Strong, and the
old woman, Rosalia Gonzales y Baca, were women of
bad moral character, unworthy of belief, and that they
would not believe them under oath, and that the old
woman, Rosalia Gonzales y Baca, was generally a very
bad woman, and a "procuress," whatever that term
may imply.  Respondent also offered witnesses who
testified that Luis Gonzales and his brother Mauricio
were of bad moral character, and that their standing
in the community for truth and veracity was bad, and
that the witnesses would not believe them on oath.  If
these witnesses were all ex-convicts, petty thieves, liars,
prostitutes, and "procuresses," and unworthy of belief,
why was respondent so solicitous about their testi-
mony? Why did he go to the penitentiary, and seek
the private interview with the convict, and say to him:
"Now, if you go and testify in this case, you will be
indicted for perjury, because these Borregos are liable
to come clear, and then they will get you for perjury.
*   *   *   I will defend you.  I will protect you." Why

did he advise Otero by wire that the service of sub-
poena in Colorado was void? Why did his confidential
agents and friends make a trip to Colorado for the pur-
pose of suppressing Nowell's testimony, by attempting
to spirit him out of the jurisdiction of the court?
Why did he secure the affidavit of Mauricio Gonzales,
for the purpose of destroying his testimony on the
trial? Why did he have his agent bring one of these
prostitutes to his private office in the nighttime, furnish
her bed and meals, and keep her there in his private
office twenty-four hours, all with his knowledge and
consent, and where, she swears, Thayer kept her locked
in and guarded her all the time, and all at his expense?
Why did he make such efforts to secure her affidavit,
through Ramon Garcia, and that, too, pending this
investigation? If these people were so unworthy of
belief, as his witnesses swore they were, what had he
to fear from such characters? What use had he for
their testimony, if he regarded them as so untruthful?
One of the strongest tests of innocence is open, frank
and fearless conduct of an accused, and his willingness
to meet any and all of his accusers face to face.   It is
true the respondent urged a speedy hearing of this
case, and, when the time was fixed for the hearing, he
loaned a new-made friend $50 as "a business accom-
modation," who immediately proceeded to Colorado,
sought an interview with the ex-convict, persuaded
him not to obey the process of the court, urged him to
go to Texas, and told him he would "get the worst of
it" if he came,—that they had "all the other witnesses
fixed."   The moral characters of these witnesses may
be, and no doubt are, not what they should be, and
they may be unworthy of belief.   But, are the facts
they testified to unworthy of belief in this case? Judge·
Seeds believed them on the preliminary examination,
and held defendants without bail.  A jury believed
these witnesses when they made a statement of the

same facts, and that, too, as against the testimony of this respondent, respondent Spiess, and a number of other highly respectable citizens, who swore that they would not believe them under oath. A judge sustained the jury in the finding of the verdict, and pronounced sentence of death on the defendants. And, from all the evidence taken together, with all the surrounding circumstances in this case, I believe they told substantially the truth. A witness may be guilty of all the most heinous crimes known, and he may be indicted, go into court, confess his crime, with the promise of·immunity from punishment, and become a witness against his co-criminals; and on his testimony, corroborated by circumstantial evidence only, a verdict of conviction be sustained. Any witness may testify to the truth in any particular case, but all witnesses do not testify to the truth in all cases. Then, the question is, did these witnesses testify to the truth, substantially in this particular case?

I understand the rule to be that, where a witness knowingly and willfully testifies falsely to material facts, his testimony may be disregarded in toto, unless corroborated by other legal evidence, and that this rule applies whether the witness has a good moral character, and stands well for· truth and veracity, or not. I believe that a court, sitting as a jury, is guided and controlled, in considering and passing on the facts brought out by the evidence, by the same rules of law which a court gives for the guidance of the jury in a similar case, when similar facts are shown before the jury; and I think that that rule is general, and should have been applied in. this case, in the same manner that it was applied to the same witnesses to like facts in the Borrego case and other similar cases, and in accordance with the practice prevailing in this jurisdiction. Respectable people do not become witnesses to assassinations by lying in wait; nor do the assassins,

as a rule, associate thereafter with respectable people, but they usually associate and converse with just the class of people that these witnesses do, and they find out, expose, and bring to light these crimes, and on their evidence guilty parties are convicted, as in the Borrego case. People whose moral character and standing for truth and veracity are unimpeachable do not, as a rule, frequent the haunts of the prostitute, "procuress" and petty thief, the very homes and comforters of crime; and if criminals shall go unwhipped of justice until reputable citizens can be found by whose testimony they may be convicted, then the law of the vigilante must be invoked, and the laws established by the wisdom and experience of the past for the protection of life, liberty and the pursuit of happiness must be abandoned.

It is not contended that all of these witnesses possessed good moral characters, nor is it contended that the standing in the community of all of them for truth and veracity is unimpeachable. Were such the facts, in all probability they would never have been witnesses in the Borrego case, and therefore not in this case. Let us see who they are, and what are their vocations in life, as shown by this record. Nowell is a very poor man, with very little education, and what is known in this country as a "frontiersman," all his life, and a hackman by occupation; but there is not a word or intimation in the record here, or in the Borrego case, that he is a dishonest man, or that he has ever been guilty of a dishonorable or dishonest act in his life, except in reference to the adultery case. Knodt is a poor man and a foreigner, with little education, speaks very little English, very poor Spanish, and very bad German (as shown by the difficulty the interpreter had in rendering his German into English), and a butcher by trade. Porfilia Martinez de Strong is very poor, a widow, the mother of several children, unable to read

or write even in her own language, and speaks very little English, of a questionable reputation, an outcast on the world, and absolutely friendless. Rosalia Gonzales y Baca is a very old, ignorant woman, in the extreme straits of poverty and distress, and denominated by some of the impeaching witnesses a "procuress." Luis and Mauricio Gonzales are both ignorant, possessed of a certain degree of cunning, but of idle and dissolute characters, without any designated occupation. Every person at all acquainted with the history of crime knows that this is just the class of people who become cognizant of the commission of crime, and expose and furnish testimony for its detection and punishment. Upon such people's testimony, the better and law-abiding classes, the courts, juries, and the administrators of the law, must rely for the enforcement of the laws, and the suppression of crime. Without the testimony of this class of people, the law would fail of vindication, and the majority of criminals would go unpunished. And it is equally as well known, too, that this class of people are sought out as proper subjects for subornation of perjury. It is unreasonable to suppose that reputable people who happen to be witnesses are approachable by the opposing side of a case; and the presumption indulged in by the court in this case, that because good citizens testify that witnesses are unworthy of belief generally, that therefore their testimony is false, is erroneous, unless it is shown by circumstantial evidence, or by disinterested witnesses, that the facts testified to by them were improbable. But such is not the fact here.

It is shown that the interviews between respondent and the witnesses Rosalia Gonzales y Baca, Mauricio Gonzales, Porfilia Martinez de Strong, and Ramon Garcia were all had in the presence of other people; but they were not introduced to support and corroborate respondent, and no reason was shown why they

were not. It is also admitted, in the opinion of the court, that "testimony has been offered which, if accepted as credible, tends to the establishment of these charges," and the dismissal is based alone on the denial by the respondent, and because other witnesses testified that they would not believe the witnesses who gave the "testimony tending to the establishment of the charges." But it is not contended that any evidence was offered, except that of the respondent, which in any manner tended to contradict any facts testified to by these witnesses in this case. There are, however, pointed contradictions to many important facts, as between the prosecuting witnesses and the respondent. The motive to suppress and destroy the testimony of these witnesses, in the Borrego case and in this case, is clearly shown; and the interest of the respondent in the result of this case was great, and important to him, while it does not appear that they had any interest whatever in the result of this case; and, according to the elementary rules of the law of evidence, every legal intendment and presumption is in favor of the truthfulness of the testimony of these witnesses. The jury are required to pass on the truth or falsity of the facts testified to before them, and not on the personal of the witnesses. The matters of moral character, and the standing for truth and veracity of the witnesses, are only incidental matters for the jury to consider. These five or six witnesses testified, each, to separate and disconnected facts, which, it is alleged, occurred at different and distinct times and places. No motive, reason, or conspiracy is either alleged or shown, as an inducement why they should have so testified, either at the preliminary hearing, or on the final trial, or at this investigation. They each separately testified to substantially the same state of facts on each particular occasion, covering a period of some eighteen months. It is not contended that one single cause usually

assigned as a reason for the giving of false testimony by witnesses was shown or existed in this case; and it was perfectly apparent to the court, from observation of these witnesses, their conduct upon the stand, and their manner while testifying, that they are wholly incompetent, from want of education, natural ability, and experience, to fabricate the facts so testified to by them. Nor is it shown or contended that any malice or illwill, on the part of any of them, existed towards the respondent; but, on the contrary, it is shown that at least one of them, who testified to very damaging facts, was a very warm personal and political friend of respondent. Nor is it contended or shown that any illegal or improper influences were brought to bear on any of them by the prosecution, or by any one else, as a reason for their so testifying; while, on the contrary, it is shown that many efforts were made, by and on behalf of respondent and his friends, to intimidate and suppress the testimony of at least some of them, and their testimony stands uncontradicted by that of any disinterested witnesses. Therefore, the presumption is that these witnesses testified, in substance, to the truth, and to presume that they testified falsely, under such circumstances, it seems to me, is a clear disregard of the most elementary rules of evidence, established by reason and experience for the guidance of courts and juries in the administration of justice from time immemorial, and is contrary to the deduction of the truth by the process of ascertaining one fact from the existence of another. That is, in this case respondent did obtain one affidavit, and did attempt to obtain another, for the purpose of suppressing or destroying the testimony of these witnesses, and did render valuable assistance to the witness Knodt, and did interview other witnesses; and the jury would be presumed to reason that, it being shown, beyond a reasonable doubt, that respondent did attempt to suppress or destroy the tes-

timony of two or three of the witnesses, and did interview the others, therefore the testimony of such witnesses is true, unless controverted by other disinterested testimony, and nothing of that nature appears in this record. To hold that such testimony, under such circumstances, is unworthy of belief, simply because the moral characters and standing-for truth and veracity of some of the witnesses are impeachable, is to destroy the most fruitful source of testimony for the detection and suppression of crime, and to break away the barriers, and open wide the gates to the criminal classes, and to subject the lives, liberties, and property of the weak and law-abiding to the will of the strong and vicious.

It is held, in the opinion of the court, "that these charges are five in number. Each stands for itself, a separate and distinct charge, as a separate and distinct act, alleged to have been done at separate and distinct times, with separate and distinct individuals." The charge is, in substance, that respondent was guilty of unprofessional conduct as a lawyer in the defense of the Borrego case; and it is one, and only one, charge, with five separate and distinct specifications. These specifications set out in detail the manner in which the unprofessional conduct is alleged to have occurred, and the testimony offered should be directed and applied to the gist of the charge, which is unprofessional conduct during the progress of the Borrego trial; and testimony offered in support of any one or more of the specifications goes to support the charge, and not to establish a separate and distinct offense, as stated in each separate specification. It can hardly be presumed that the committee would have attempted to establish so serious a charge on the testimony of any one witness to any one of the specifications; nor should it be presumed that this court would have spent its time hearing a charge against a lawyer based simply on the testimony of any

one of these witnesses.    Such a course would subject both the committee and the court to the criticism of frivolity.    The same rule that applies in other cases should apply in this, and that is, that all the evidence, both direct and circumstantial, must be taken and considered together.    It is an elementary principle that a trial court must instruct the jury to take and consider together all the evidence before them, and render a verdict accordingly.    The rule attempted to be established by the court is unfair to the respondent, because it might be held that the proof was sufficient to establish the allegations in one of the specifications, yet if the allegations in the remaining four specifications were satisfactorily explained away, the court would hardly be warranted in entering an order of disbarment, on the principle, "De minimis non curat lex." The principle that the testimony of any one of the witnesses might have been insufficient to sustain the charge, but when all the testimony of all the witnesses, with all the circumstantial evidence offered, is taken together, is sufficient, is well illustrated by the old fable that a bundle of sticks is stronger than any single stick, and this was the principle pursued by respondent; that is, that while his testimony alone was not strong enough to overcome the combined strength of all the testimony for the prosecution, he therefore offered other witnesses to destroy and break the strength of the prosecution's evidence.

The opinion also states:    "Prominent citizens of this community, officials in high standing, prominent members of the bar, reputable business men, in large numbers, have come upon the stand, and have testified, without qualifications, that they would not believe these witnesses under oath, in consequence of their character, their reputation, and their standing in this community."    If I believed this statement from the evidence in this case, and if I had the power, I would

grant those four defendants a new trial, just as soon as
I could sign my name to the order.   I believe the law
protects, with its mantle of mercy, alike, the rich and
the poor, the high and the low; and those four men
now awaiting in solemn solitude, under the pall of the
death sentence, pronounced by the same learned and
honored judge who uttered the above strong and cutting
sentences, are just as much entitled to their lives as the
respondent is to practice law at this bar.   Their lives
and their liberties are just as sweet, dear, and valuable
to them and their loved ones, as the honor, profits, and
emoluments are to the respondent as a lawyer.   If this
testimony against them in that case was found sufficient,
to the exclusion of all reasonable doubt, to convince a
jury of twelve good and lawful citizens of the guilt of
the accused, and the judge concurred in that view, why
is it not sufficient to sustain these charges?   Without
their testimony, the verdict certainly would not stand.

It was contended by respondent, as an excuse for
sending out for his witnesses, friends of the defendants,
that he could not trust the officers of the court to sub-
poena them in the regular way, and it seems to be the
view of the court also; but there is not a word (except
in the testimony of the respondent) in the record to
show that the officers were not as faithful in their duties
to defendants as to the prosecution.   The committee
offered in open court to connect respondent with the
authorship of an article in a newspaper containing
severe strictures on this court with regard to the con-
duct of this case; but respondent's counsel vehemently
opposed its introduction, and the court ruled it out.
Why was this done, if respondent was innocent, and
courted a fair, full, and honest investigation?   The
respondent stands before the court, not as an ordinary
person.   He is learned in the law, and is far in advance
of the ordinary lawyer in the practice of the profession;
and in such matters he well knows that "his conduct is

attributable to his supposed knowledge that the truth would militate against him." The suppression or fabrication of evidence always raises a presumption against the accused, in matters of fact before a jury, and the maxim, "Omnia praesumuntur contra spoliatorem," applies here with great force. 1 Greenl. Ev. 37.

The opinion of the court states that "the uncontradicted record shows Nowell to have been a penitentiary convict, indicted, tried, and convicted of a felony, and sentenced to imprisonment. He abandoned his family, disavowed his marriage." * * * That he was tried, convicted, and sent to prison is not denied; but that he was tried and convicted of a felony is denied. He was convicted of the crime of adultery, under what is known as the "Edmunds-Tucker Act" of congress. But that is not a felony under the law, because that act does not declare the crime of adultery a felony; and it is not a felony at common law, because it is by the act of congress a purely statutory offense, and not even bigamy or incest are by that act declared felonies. Supp. Rev. Stat. U. S., p. 568; U. S. v. Vigil, 34 Pac. Rep. (N. M.) 530; Rev. Stat. U. S., sec. 819; U. S. v. Coppersmith, 4 Fed. Rep. 198; U. S. v. Yates, 6 Fed. Rep. 861; U. S. v. Daubner, 17 Fed. Rep. 793; U. S. v. Bayle, 1 Fed. Rep. 784. And many other authorities might be cited. And there is not a line or a word in this record, in the record of the Borrego case, or in the adultery case, to sustain the statement that Nowell "disavowed his marriage;" and the only hint at such a thing was suggested by respondent's counsel, on mere idle rumor, that Nowell had told the respondent Spiess that he had never been married. That was all there was of it, and nothing else whatever even tended to show that Nowell had ever at any time "disavowed his marriage."

There were some questions which arose during the progress of the trial which I deem of sufficient impor-

tance, in the due administration of justice to notice here, and from which I dissented from the views of the majority of the court at the time; but, owing to the necessity for a speedy hearing, the members of the court could not then express their views in writing. I was of the opinion then, and am still of the opinion, that all evidence offered tending to show complicity of respondent in any way to intimidate or influence witnesses on the hearing, or in the publication of a newspaper article or articles reflecting·upon the court, or any member of it, in connection with this hearing then pending before it, should have been admitted. The committee charged with the prosecution stated that they expected to connect the respondent with these acts. The evidence was admissible upon the plainest and most fundamental principles of evidence; that is, that all acts done for the fabrication or suppression of evidence, for the intimidation of witnesses, jurors, or courts, are acts evincing a consciousness of guilt, and therefore admissible. Innocence trusts to truth, and relies on legal methods to have the truth shown, and the judgment of the court rendered according to the demands of justice. Nothing was shown which should have changed the rule on this hearing. All the facts should have been permitted to see the light of day. The rules of evidence are not intended for the suppression of facts, if these facts tend to· aid in the determination of the issues involved; and so should they have been applied. It is not necessary to cite authorities to establish the principle for the admissibility of this evidence. I know of nothing whatever which would justify its exclusion.

I do not believe that an attorney is authorized to visit and talk to witnesses who are expected to testify on the opposite side of the case, and learn from them what they know, and are expected to swear to in that case; and I am sure they should not do so under any circumstances, after the witness has once testified in the

case. This principle is strongly illustrated, in the Borrego trial, in the case of the witness Max Knodt, whose testimony on the preliminary hearing was very damaging to the clients of respondent; but, as soon as he received the pass, through the influence of the respondent, his memory failed him, and his testimony became valueless to the prosecution, and, in so far as the testimony of that witness was pertinent, the due administration of justice was defeated. I know of no code of moral or legal ethics which would warrant any attorney in such conduct, and I think the attorney who permits himself to do so, steps clear beyond the bounds of his duties and responsibilities in the legal profession, and becomes guilty of a "moral delinquency," at least, and subjects himself to disbarment. The legal profession needs no code of rules for its guidance. It is composed of too many honorable and illustrious men to require any such restraints. The profession is composed of lawmakers, as well as administrators of the law; and the only rule that I know of for their guidance in their profession is a clear and distinct knowledge of the scope of their professional duties, and a conscientious belief in the right, frankness and honesty of their acts. The late Mr. Associate Justice MILLER, in language as clear and pure as the sunbeams, has said: "The lawyer in this country is one of the administrators of justice. The judge who presides in the court is another, with more authority of position, and perhaps in some respects a more burdensome one. But the court, and the clerk, and the marshal, the sheriff, the jury, the lawyer, all constitute ministers of justice; and a lawyer who consciously undertakes to thwart justice is unfit for the position, as much as the judge who accepts a bribe, or knowingly decides a case against the law and the right, and it should be understood that they are subjected to the same responsibilities. They have a duty, undoubtedly,

to their clients; but that is not the first duty, as is generally supposed. Their first duty is the administration of justice, and their duty to their clients is subordinate to that." In re Thomas, 36 Fed. Rep. 242. The methods resorted to in securing the affidavit of the witness Mauricio Gonzales, and in attempting to secure that of the witness Porfilia Martinez de Strong, are not such as to command favorable consideration from the court. In speaking of the preparation of affidavits for clients and witnesses to sign by an attorney, Judge Sharswood, in his work on Legal Ethics (page 111) says: "The client will be often required, in the course of a cause, to make affidavits of various kinds. There is no part of his business with his client in which a lawyer should be more cautious, or even punctilious, than this. He should be careful lest he incur the moral guilt of subornation of perjury, if not the legal offense. An attorney may have communications with his client in such a way, in instructing him as to what the law requires him to state under oath or affirmation, in order to accomplish any particular object in view, as to offer an almost irresistible temptation and persuasion to stretch the conscience of the affiant up to the required point. Instead of drawing affidavits, and permitting them to be sworn to, as a matter of course, as it is to be feared is too often the case, counsel should on all occasions take care to treat an oath with great solemnity, as a transaction to be very scrupulously watched, because involving great moral peril, as well as liability to public disgrace and infamy. It lies especially in the way of the profession to give a high tone to public sentiment upon this all-important subject, the sacredness of an oath. It is always the wisest and best course, to have an interview with the client, and draw from him, by questions, whether he knows the facts which you know he is required to state, so that you may judge whether, as a conscientious man, he ought to make

such affidavit.'' The assistance rendered Otero, in his efforts to spirit away the witness Nowell for the purpose of suppressing his testimony on this hearing, and the favors granted the witness Knodt, and his consequent obligations to the respondent, followed by his loss of memory at the Borrego trial, do not shine with any degree of credit on the side of the respondent, and do not comport with the duties and responsibilities of the profession; and an attorney who permits himself to engage in such practices lays himself open to the charge of ''tampering'' with witnesses, and shows either an utter forgetfulness of the high responsibilities of his position, or a gross disregard for an honest administration of justice. If such acts are to be passed over unnoticed by the courts, then the profession will be reduced, from that high and honorable place to which it belongs, to the level of the trickster and charlatan; and while the lawyer who engages in such practices may become distinguished among a class of people who indulge in such methods in the conduct of their own affairs, yet he can never expect to achieve the fame of a Marshall or a Webster, but he will sooner or later find himself at the very bottom of the ladder.

After a careful observation of the witnesses, the manner of their testifying while upon the stand, their interest or noninterest in the results, and a conscientious consideration of all the testimony evolved on the hearing, I am irresistibly driven to the conclusion, however unpleasant it may be, that the legal evidence contained in the record sufficiently sustains the charge of unprofessional conduct on the part of the respondent during the progress of the trial of the said Borrego case, and I so find. The charge against respondent Spiess consists of four specifications; and, as the greater part of the facts are set out in the opinion of the court, it is sufficient for me to say that I can not concur in the conclusions therein reached for the reasons hereinbefore stated.